**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**August 20, 2003**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**

**FIFTH CIRCUIT**

_____

No. 01-50010
_____

BILLIE WAYNE COBLE,

Petitioner - Appellant,

versus

JANIE COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

Respondent - Appellee.

Appeal from the United States District Court
For the Western District of Texas
No. W-99-CA-080

Before JOLLY, EMILIO M. GARZA, and STEWART, Circuit Judges.

PER CURIAM:*

Petitioner Billie Wayne Coble was convicted of capital murder in Texas and sentenced to

death. He now requests a Certificate of Appealability (COA) from this court on eleven various issues.

I

_____

*Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

On April 9, 1990, Coble was convicted of the capital murders of his brother-in law, father-in law, and mother-in law. The basic facts of Coble's crimes are set forth in the opinion of the Texas Court of Criminal Appeals (TCCA) disposing of Coble's direct appeal. Coble was having marital problems and separated from his wife, Karen Vicha, not long before the murders. On July 18, 1989, Coble kidnapped Karen Vicha at knifepoint. He attempted to convince her not to divorce him, but eventually released her unharmed. *Coble v. Texas*, 871 S.W.2d 192, 195-96 (Tex. Crim. App. 1993) (en banc).

Several weeks later, on August 29, 1989, Coble was seen driving around the area where Karen Vicha and her parents lived in Axtell, Texas. *Id.* That afternoon, he was waiting at his wife's house when her daughters returned from school. Coble handcuffed and tied up her three children and one of their cousins. *Id.* at 196. Next, Coble cut the phone lines to the house and went down the street to the house of his brother-in-law, Bobby Vicha. Coble and Bobby Vicha struggled, but Coble ultimately shot Bobby Vicha in the neck. *Id.* at 196-97 & n.6. He returned to Karen Vicha's house for a time, and then went across the street to the Vicha family home. The body of Zelda Vicha, Coble's mother-in-law, was found shot on the floor of the garage. Robert Vicha, Coble's father-in-law, was found inside the house, also fatally shot. The phone lines to the Vicha family home had been cut. *Id.* at 196-97.

When Karen Vicha arrived home from work, Coble was waiting for her. *Id.* at 197. He admitted to killing her parents and brother, and told her that Bobby Vicha had shot him. He then handcuffed her and drove her out to the country in her car. Karen Vicha later testified that Coble had assaulted her during the drive. Coble was eventually apprehended after a brief high-speed pursuit, which ended when Coble crashed the car into a parked car. At the hospital where Coble and Karen

Vicha were taken for treatment, Coble spontaneously told various hospital personnel and police officers that he had killed three people. *Id.*

At the close of the penalty phase evidence, the jury answered the special issues in the affirmative and the judge sentenced Coble to death. His direct appeal was affirmed by the TCCA, and the Supreme Court denied his petition for a writ of certiorari. *Id.* at 208, *cert. denied*, 513 U.S. 829 (1994).

In 1997, Coble filed an application for a state writ of habeas corpus, alleging twenty-six claims for relief. The trial court held an evidentiary hearing on five of these claims, but recommended that relief be denied. The TCCA agreed, adopted the trial court's findings of fact and conclusions of law, and denied relief in an unpublished order. *Ex parte Coble*, No. 39,707-01 (Tex. Crim. App. 1999).

Coble then applied for federal habeas relief, and the district court appointed counsel in March 1999. Coble filed his full habeas petition, alleging twenty-five claims in May 1999, and the district court stayed his execution pending resolution of the petition. The district court denied Coble's request for an evidentiary hearing and denied the writ. The court did, however, grant a partial COA on the issue of ineffective assistance of counsel. Coble now seeks a COA from this court on eleven additional grounds.

## II

To receive a COA, Coble must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). This showing requires that Coble "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In capital cases, doubts about whether the petitioner has met

the standard must be resolved in favor of the petitioner. *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). When a petition is dismissed on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added).

The Supreme Court recently reiterated that, at the COA stage, a court should "limit its examination to a threshold inquiry into the underlying merit of his claims." *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1034 (2003) (citing *Slack*, 529 U.S. at 481). We do not fully consider the factual or legal "bases adduced in support of the claims," and a petitioner need not show that an appeal will succeed in order to be entitled to a COA. *Id.* at 1039. "The question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Id.* at 1042.

The district court should have evaluated the habeas petition to see if the state court's determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). In addition, a state court's findings of fact are entitled to a presumption of correctness unless the petitioner rebuts that presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Thus, when evaluating a COA petition, we consider *only* whether the district court's application of AEDPA deference to the petitioner's claim is debatable among jurists of reason. *Miller-El*, 123 S.Ct. at 1041-42.

III

As noted above, Coble seeks a COA on eleven separate issues. We now consider each of Coble's claims in turn.

A

First, Coble argues that the "special issue" interrogatories in the Texas capital sentencing instruction, as applied to his case, precluded effective presentation of mitigating evidence in violation of the mandates of *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*"), and *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"). Thus, Coble contends that the instructions given to the jury violated his Sixth, Eighth, and Fourteenth Amendment rights.

Coble's trial was held between the Supreme Court's decisions in *Penry I* and *Penry II*. In *Penry I*, the Court held that the first two "special issue" interrogatories in the Texas capital sentencing instructions,[1] though facially valid, failed to satisfy the constitutional requirement that a capital defendant be able to present and have the jury fairly consider mitigating evidence in certain situations. 492 U.S. at 315, 328. After *Penry I*, Texas trial courts still gave the special issue interrogatories to the jury, but added a supplemental instruction to "cure" any possible *Penry* defect. Eventually, the Texas legislature adjusted the special issues to add a mitigating evidence question. *See Robertson v. Cockrell*, 325 F.3d 243, 248-49 & n.4 (5th Cir. 2002) (en banc) (describing the background of the period between *Penry I* and *Penry II* and detailing the new special issue). Coble's jury, however, received the interim supplemental instruction, as did Penry's jury when his case was retried.

---

[1]The special issues are set out in TEX. CRIM. PROC. CODE art. 37.071. Under the version of the statute in force when Coble was tried, the first special issue addressed whether the defendant had acted "deliberately and with the reasonable expectation that the death of the deceased or another would result." The second special issue instructed the jury to consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The third special issue, which is not relevant to the *Penry I*/*Penry II* analysis, addressed whether the defendant's conduct was a reasonable response to the provocation, if any, of the victim. TEX. CRIM. PROC. CODE art. 37.071(b)(1)-(3) (Vernon 1981).

In *Penry II*, the Supreme Court again considered a constitutional challenge from Penry. It considered the supplemental instruction given at Penry's subsequent retrial,[2] and held that the instruction failed to give Penry's jurors a "vehicle" by which they might give effect to his mitigating evidence. *Penry II*, 532 U.S. at 787, 798. Specifically, the Court held that the supplemental instruction potentially created an unacceptable dilemma for the jurors: Because it instructed the jurors to change one of their truthful "Yes" special issue answers to a "No" if they felt the defendant did not deserve the death penalty, it left the jurors with the choice of either not giving effect to Penry's proffered mitigation evidence or, alternatively, violating their oath as jurors. *Id.* at 798-801.

Coble argues that the supplemental instruction given at his trial, which was virtually identical to the one given at Penry's trial,[3] created the same situation that the *Penry II* court found

_____

[2]In its opinion, the Court restated the instruction:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues.

*Penry II*, 532 U.S. at 789-90.

[3]The State concedes this fact. In its entirety, the supplemental instruction given at Coble's trial, reads as follows:

constitutionally unacceptable. In other words, Coble argues that the instruction (1) did not enable the jury to give effect to his proffered mitigating evidence and (2) rendered the jury instructions, taken as a whole, self-contradictory.

This court recently considered "the circumstances under which the Texas special issues might fail to facilitate a sentencing jury's consideration of mitigating evidence and, second, of the supplemental instruction's ability to cure such a failure" in an *en banc* case. *Robertson*, 325 F.3d at 244. In that case, the petitioner made essentially the same arguments that Coble now makes. Thus, we must apply the analysis announced in *Robertson* to Coble's request for a COA. We must first consider whether the Texas special issues created the same problems in Coble's trial as they did in *Penry I*. *See id.* at 249. In other words, did Coble present *Penry*-type mitigating evidence, such that the Texas special issues did not allow the jury to take that evidence into account?

During the sentencing phase, the State presented evidence that Coble had beaten all of his ex-wives on different occasions and threatened to kill at least one of them if she divorced him. The State also presented evidence that Coble had molested teenage girls on at least two occasions. Finally, one

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider the mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, and thereafter give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one or more of the special issues under consideration.

man testified that Coble had admitted to assaulting another man with a hammer in the past.

In response, Coble offered a variety of mitigating evidence. First, he presented non-psychiatric mitigating evidence. Coble's father died before he was born, and when he was eleven, his mother suffered a nervous breakdown, so Coble was sent to live at a state facility. He lived at the orphanage until he was seventeen, at which point he joined the Marines and served in Vietnam. During his four years of service, Coble served as a machine gunner and was involved in combat. Upon his return to the states, Coble was hospitalized due to the trauma he experienced in the war. Likewise, Coble's sister testified that he was different after he returned from Vietnam. Coble offered testimony that he was involved with various youth programs over the years, that he had a good relationship with his son, and that he got along well with co-workers. Coble served as a section leader in the U.S. Army reserves and was well respected.

Coble also presented the testimony of two psychiatrists. The first, Dr. Stephen Mark, testified that Coble was dangerous and might continue to be a danger. In fact, Mark testified that everything in Coble's history would make him a continuing threat. Mark also testified that Coble suffered from post-traumatic stress disorder (PTSD) and bipolar disorder, and was prone to become "[p]otentionally explosive and potentially aggressive and assaultive." Mark traced the post-traumatic disorder to Coble's experience in Vietnam, and suggested that the bipolar disorder might be hereditary. Mark also indicated that these illnesses made Coble susceptible to severe mood swings, which resulted in a loss of control on the day of the murders.

Mark did, however, indicate that Coble would be less likely to be violent if he took medication. In fact, Mark indicated that, had he known, before the murders, of Coble's past and the depression Coble was experiencing because of the pending divorce and kidnapping charges, he would

have recommended hospitalization for further treatment and evaluation. Mark also conceded that if Coble refused to take medication he would probably be violent in the future.

Dr. James Grigson, the second defense expert, testified that Coble was suffering from severe depression at the time of the murders, and that it was very improbable that Coble would commit this type of offense again. Specifically, Grigson stated that Coble was more horrified by the pictures of the victims than anyone, and that Coble had feelings of remorse and guilt. Both psychiatrists agreed that Coble linked the loss of his wives with the loss of his mother, such that the divorces triggered severe bouts of suicidal depression. Grigson also discussed a psychiatric report on Coble that was created in 1964 when Coble was 15 ("the 1964 report").

To rebut the psychiatric testimony, the state presented Dr. Richard Coons. Coons testified that, based on Coble's history of emotional instability and violence, there was a probability that he would continue to be dangerous in the future. In making this determination, Coons relied heavily on the 1964 report.

Whether Coble's evidence of mental illness, specifically PTSD and bipolar disorder, qualifies as *Penry*-type mitigating evidence is determined by the stringent test formulated in *Graham v. Collins*, 950 F.2d 1009 (5th Cir. 1992) (en banc), *aff'd*, 506 U.S. 461 (1993), and readopted in *Robertson*. To qualify, mitigating evidence must be "'due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own.'" *Robertson*, 325 F.3d at 251 (quoting *Graham*, 950 F.2d at 1029). In addition, the criminal acts of the defendant must be attributable to the severe permanent condition. This test implicates the principles of voluntariness,

permanence, severity, and attribution.[4] *Id.* We consider each in turn.

First, it is at least debatable whether Coble's mental illnesses were voluntary. No one seems to dispute that the illnesses stemmed from events beyond Coble's control—such as hereditary factors, his childhood, and his combat experience. *Cf. Blue v. Cockrell*, 298 F.3d 318, 321 (5th Cir. 2002) (finding paranoid schizophrenia, among other mitigating evidence, to be *Penry* evidence).

Second, it is not entirely clear whether Coble's mental illness is permanent. It may be that Coble's mental illnesses can be treated in such a way that he will not be dangerous in the future. If so, then Coble's evidence would have been encompassed by the "future dangerousness" special issue.[5] *Cf. Robison v. Johnson*, 151 F.3d 256, 265-66 (5th Cir. 1998) (addressing defendant's evidence of schizophrenia and denying the *Penry* claim because evidence had been presented to the jury that schizophrenia was treatable); *see also Lucas v. Johnson*, 132 F.3d 1069, 1082-83 (5th Cir. 1998). We note, however, that Mark's testimony on the issue of whether Coble's illnesses could be treated such that he would not be dangerous was, at the least, somewhat equivocal. Thus, we find this prong of the test to be debatable among jurists of reason. *See Robison*, 151 F.3d at 265 (granting COA); *Lucas*, 132 F.3d at 1073 (granting a CPC).

---

[4]As a preliminary matter, the "positive" mitigating evidence of good character introduced by Coble, including his volunteer activities and his military service, is decidedly not *Penry* evidence. *See Graham v. Collins*, 506 U.S. at 475-76 (concluding that mitigating evidence of youth, family background, and positive character traits are adequately covered by the second special issue that relates to future dangerousness). Accordingly, we focus on Coble's evidence of mental illness.

[5]It may also be that the jury could have effectively considered the mitigating effect of Coble's mental illnesses when they answered the "deliberateness" special issue. *See Lucas*, 132 F.3d at 1082; *Davis v. Scott*, 51 F.3d 457, 462-63 (5th Cir. 1995). If Coble was unable to control his actions on the day of the murders, as Mark testified, then the jury may have fully considered that testimony when they considered the court's definition of "deliberately" and applied that to their resolution of the first special issue.

Third, Coble has made the necessary threshold showing that his disability was severe. Mark testified that the murders were the result of Coble's total loss of control. In addition, Coble's depression was characterized as "severe." Fourth, Coble must show that his criminal acts were a consequence of his illness. In *Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002), we concluded that evidence of an antisocial reaction disorder was not *Penry* evidence because the experts did not believe that the disorder caused the defendant to commit the crime. *Id.* at 682. In this case, however, the psychiatrists seemed to agree that it was Coble's episodic depression, manic mood swings, and propensity for violence created by his combat experience that led him to act as he did when committing the crime. In addition, Mark testified that Coble's illnesses caused him to lose control on the day of the murders. Thus, Coble has made a threshold showing that his crimes are attributable to his illnesses. *Cf. Madden v. Collins*, 18 F.3d 304, 307 (5th Cir. 1994) (considering testimony about anti-social disorder and rejecting it as *Penry* evidence because there was no testimony that the defendant's criminal actions were attributable to the disorder).

We therefore find that it is debatable whether Coble's evidence of mental illness constitutes *Penry* evidence. Given this, and the fact that Coble's jury was given a supplemental instruction that was virtually identical to the one rejected in *Penry II*, there is at least a possibility that the jury instructions in Coble's trial were constitutionally inadequate. Accordingly, we find that Coble has made a substantial showing on the *Penry II* issue and we grant COA.

B

We find, however, that Coble's remaining ten claims do not meet the standard for issuance of a COA. We now briefly consider each of these claims.

First, Coble claims that his Sixth Amendment right to effective assistance was violated

because his lead counsel, Ken Ables,[6] was intoxicated and thus functionally absent during the trial. Specifically, Coble alleges that various persons smelled alcohol on Ables's breath as he went in and out of the courtroom. Coble supports this allegation with affidavits from (1) his mother, Loreais Bird; (2) his sister, Mary Oller; and (3) Rusty Cole, an acquaintance who witnessed his trial. Coble has also produced an affidavit from Debora Hutchins, a former acquaintance of Ables, in which she states that she knew Ables to have had a drinking problem. In a 1999 deposition taken during the habeas proceedings in district court, Ables disputed that he was ever intoxicated and claimed that some of his stumbling in the courtroom was due to a hip replacement surgery and related problems with his left leg.

To prevail on this claim, Coble must show (1) that his counsel's performance was deficient because it fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). Coble's counsel's performance was deficient if it fell "'below an objective standard of reasonableness' as measured by professional norms." *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) (quoting *Strickland*, 466 U.S. at 688)). To establish prejudice, Coble must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. We may reject a petitioner's argument on either prong, eliminating the need to consider the other. *Id.* at 697.

The state habeas court considered this claim and held that Ables was not intoxicated during the trial, explicitly finding Coble's allegations to be untrue. In addition, the state habeas court found that it would not have mattered if Ables was functionally absent during part of the trial because Coble

---

[6]Ables died on September 26, 1999.

had two attorneys at all times. The district court also considered this claim and concluded that Coble had not sufficiently rebutted the presumption of correctness owed to the state court's findings of facts. Specifically, it noted that Ables was present during the trial and attended conferences in chambers. Coble also told the trial judge that he was satisfied with his legal representation.

The affidavits presented by Coble were found to be of little probative value by both the state habeas court and the district court because the affiants are closely connected to Coble. It is not the place of this court to contradict the credibility judgments of these courts. We cannot reject the factual findings of the state court unless the findings "lacked even 'fair support' in the record." *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983). With regard to this issue, there is more than fair support in the record for the state court's findings. Thus, the district court's determination that Coble had not rebutted the state court's finding that Ables was not intoxicated is not debatable. We deny COA on this issue.

Second, Coble asserts that he did not get the independent expert he was entitled to under *Ake v. Oklahoma*, 470 U.S. 68 (1985), and thus his due process rights were violated. In *Ake*, the Supreme Court held that "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense" when the defendant's sanity is a significant factor in the trial. *Ake*, 470 U.S. at 83. Coble argues that, although the State provided him with the assistance of Mark and Grigson, he did not get the assistance mandated by *Ake* because Mark's performance was incompetent.[7] Unfortunately, Coble's petition is not very specific about what Mark did poorly. He

_____

[7]Before the district court, Coble argued that both Mark and Grigson were incompetent. On appeal, he only mentions Mark. Thus, he has waived his concerns about Grigson.

suggests that Mark erred by "testifying one way on direct and reversing himself on cross-examination." He also alleges that his experts "actively aided the prosecution in proving their case." Before the district court, Coble faulted Mark for testifying that he might be a danger in the future.

The state habeas court considered this claim and determined that Coble was not entitled to the assistance of a psychiatrist who would testify the way he wanted and that Coble was given the "meaningful access" contemplated by *Ake*. Likewise, the district court concluded that Coble was given the services of two experts, neither of which was incompetent. Further, the district court noted that *Ake* did not entitle a defendant to an expert that would testify that the defendant would not be a future danger.

We find that Coble has not shown that the district court's resolution of this claim is debatable. Coble was provided with not one, but two psychiatric experts. *See Glass v. Blackburn*, 791 F.2d 1165, 1169 (5th Cir. 1986) (implying that the provision of more than one expert exceeds the mandate of *Ake*). In addition, Coble has not shown that either psychiatrist was incompetent. The fact that Mark's testimony was not as favorable as Coble would have liked does not render Mark's performance incompetent. *Ake*, 470 U.S. at 83 (holding that defendant is not entitled to expert "of his personal liking"); *Granviel v. Lynaugh*, 881 F.2d 185, 192 (5th Cir. 1989) (holding that *Ake* does not give a defendant the "right to the appointment of a psychiatrist who will reach biased or only favorable conclusions"). We deny COA on this issue.

Third, Coble alleges that some of the prosecutor's statements at trial constituted misconduct and thus denied him due process. Coble has inadequately briefed this claim. He does not indicate which statements by the prosecutor were inappropriate and he does not explain how these statements prejudiced his trial. Thus, this argument is waived, and we do not address it further. *Trevino v.*

-14-

*Johnson*, 168 F.3d 173, 181 n.3 (5th Cir. 1999).

Moreover, were we to consider this claim, we would agree with the district court's analysis. The district court considered eleven specific points raised by Coble, and held that, as the state court found, Coble had mostly procedurally defaulted this claim by either failing to object to the statements at trial or failing to raise the issue on direct appeal. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996). With regard to the non-defaulted points, the district court found that the TCCA reasonably rejected them on direct appeal. *See Coble*, 871 S.W.2d at 205-06. Coble now argues that the procedural default should be excused because of the ineffective assistance of his counsel. Coble has presented nothing to this court that suggests the district court's resolution of this issue is debatable among jurists of reason. Thus, Coble is not entitled to a COA on this issue.

Fourth, Coble contends that Section 19.03(a)(6)(A) of the Texas Penal Code,[8] the statutory provision under which he was indicted, is unconstitutionally vague and thus he was denied due process. Specifically, he faults the statute because it does not define the phrase "in the same criminal transaction" in a way that is clear enough to allow the jury to decide the guilt or innocence issue. The legislature does not provide a definition for this term, and the trial court did not define the term for the jury during Coble's trial.

---

[8]This section provides, in pertinent part:

> (a) A person commits [capital murder] if he commits murder . . . and:
>> (6) murders more than one person:
>>> (A) during the same criminal transaction. . . .

TEX. PENAL CODE § 19.03(a)(6)(A) (Vernon 1989) (*now codified at* TEX. PENAL CODE § 19.03(a)(7)(A)).

With regard to his crimes, Coble argues that the murders did not take place over a short period of time but were each separated by at least an hour. In addition, each murder was committed in a different location. Thus, according to Coble, the murders were not part of one "criminal transaction." Coble also argues that this application of § 19.03(a)(6)(A) violates *Furman v. Georgia*, 408 U.S. 238 (1972), because it does not sufficiently narrow the class of persons subject to the death penalty.

In his state habeas petition, Coble argued the statute was unconstitutionally vague on its face and as applied to him. The state habeas court rejected this claim, and the TCCA affirmed. *See Vuong v. Texas*, 830 S.W.2d 929, 941 (Tex. Crim. App. 1992) (en banc) (rejecting argument that "same criminal transaction" language was void for vagueness as applied to that defendant because the crimes were a "continuous and uninterrupted chain of conduct"); *Coble*, 871 S.W.2d at 199 (finding, on direct appeal, that the evidence was sufficient to show that Coble's crimes were a "continuous and uninterrupted series of events"). The district court also denied relief, noting that if a term "in its common meaning is sufficiently clear to allow the jury to decide" the question presented, then the trial court's failure to define it does not raise due process concerns. *Thompson v. Lynaugh*, 821 F.2d 1054, 1060 (5th Cir. 1987). In his petition to this court, Coble has not shown that it is debatable that the state habeas court's rejection of his vagueness argument was unreasonable or contrary to clearly established federal law. Thus, Coble is not entitled to a COA on this issue.

Fifth, Coble asserts that the Texas special issues, as applied to him, are unconstitutionally vague. Coble argues that these terms do not provide a rational basis for a jury to distinguish between those defendants eligible for the death penalty and those that are not. As discussed *supra*, the first special issue required the jury to decide whether the defendant acted "deliberately." The second

special issue directed the jury to determine the "probability" that a defendant will be a continuing threat to society. *See* TEX. CODE CRIM. PROC. art 37.071(b) (Vernon 1981). During the sentencing phase, the trial court defined "deliberately" for the jury and distinguished it from "intentionally."

Coble made this argument during the state habeas proceeding, and the Texas courts rejected it as contrary to settled law. *See, e.g.*, *Rodriguez v. Texas*, 899 S.W.2d 658, 664 (Tex. Crim. App.1995) (holding that identical instruction on "deliberately" is not error); *Sattiewhite v. Texas*, 786 S.W.2d 271, 290 (Tex. Crim. App. 1989) (upholding the constitutionality of the first special issue). The district court also rejected Coble's argument, holding that it was barred by *Teague v. Lane*, 489 U.S. 288 (1989). Coble has not attempted to demonstrate that the district court's application of *Teague* is debatable. In fact, Coble does not even mention *Teague* in his petition to this court, nor does he cite any case law to support his argument. In any event, we have rejected Coble's argument in the past. *See Barnard v. Collins*, 958 F.2d 634, 641 (5th Cir. 1992). Thus, we deny COA.

Sixth, Coble asserts that he was involuntarily medicated with 50 milligrams of Vistaril, an antihistamine and anti-anxiety agent, on one afternoon of the trial. He also alleges that the medication impaired his ability to concentrate, and, as a result, he involuntarily relinquished his right to testify. The following day, Coble informed the trial judge that he was satisfied with his attorneys' performance and that he wanted to waive his right to testify. Coble now says he has only a vague memory of this discussion because of the medication. He also claims that he was unable to fully and fairly develop this claim before the state court because that court would not provide the funding for an expert on the effect of Vistaril.

The state habeas court conducted an evidentiary hearing on this claim. It concluded that Coble had not shown that he was forced to take the Vistaril or that the one-time regular dose of

-17-

Vistaril would have affected his concentration or memory. It also held that Coble's claim was without merit because he had not explained how his testimony would have changed the outcome of the trial in any way. The district court also considered this issue in-depth, and we adopt that analysis. To this court, Coble makes a variety of unpersuasive arguments that he did not voluntarily take the Vistaril. Overall, he has not shown that the district court's resolution of this issue is debatable. Thus, Coble is not entitled to a COA on this issue.

Seventh, Coble claims that his court-ordered psychiatric examination by the State's psychiatrist, Dr. Coons, violated his Fifth and Sixth Amendment rights. Coons examined Coble on the issue of Coble's future dangerousness but allegedly did not warn Coble of his *Miranda* rights. Coble bases his arguments on *Estelle v. Smith*, 451 U.S. 454 (1981), in which the Supreme Court held that a psychiatrist's testimony was inadmissible under the Fifth Amendment because the defendant was not warned of his rights before he was examined. Coble also claims that it was impermissible for Coons to testify regarding the 1964 report, which was prepared by a Dr. Hodges when Coble was 15 and living at the orphanage, because Hodges did not comply with *Estelle* when preparing that report.

The district court considered this claim and rejected it, finding that Coble had submitted to Coons's examination voluntarily, with the knowledge and consent of his attorneys, after Coble had presented psychiatric testimony for his own benefit. We find the district court's analysis persuasive as to both Coons's examination and his use of the 1964 report. *See Buchanan v. Kentucky*, 483 U.S. 402, 422-25 (1987); *Penry II*, 532 U.S. at 794-96. Most importantly, *Estelle* violations are subject to harmless error analysis. *Penry II*, 532 U.S. at 795. Coble has failed to even allege, much less show, harm. Accordingly, we deny COA.

Eighth, Coble alleges that the trial court's instruction to the jury to ignore his eligibility for parole (and the minimum time he would serve if sentenced to life) violated his constitutional rights. The state habeas court and the district court rejected this claim because they found it was contrary to well-settled law. As we have stated in the past, the Constitution does not require that a capital sentencing jury be told of the parole implications of a life sentence because Texas does not offer life without parole as an alternative to the death penalty. *Miller v. Johnson*, 200 F.3d 274, 290-91 (5th Cir. 2000). Coble is not entitled to a COA on this issue.

Ninth, Coble contends that the pre-trial publicity surrounding his case was so extensive, prejudicial, and inflammatory that it denied him his right to a fair trial. To be entitled to a COA on this issue, Coble must make a substantial showing not just that there was extensive community knowledge of the crimes, but that "the trial atmosphere [was] *utterly corrupted* by press coverage." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (emphasis added).

The state habeas court considered this claim and found that the publicity was not extreme or extensive enough to prevent the possibility of empaneling an impartial jury. In addition, the district court emphasized that all the pretrial publicity occurred more than six months before Coble's trial, and that the state court had fully considered this issue pre-trial when it ruled on Coble's motion to transfer venue. Although there was a fair amount of press coverage, it occurred many months before the trial, and Coble has not shown that it so pervaded or saturated "the community as to render virtually impossible a fair trial by an impartial jury drawn from that community." *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984) (citation omitted). Coble has not shown that the district court's assessment of this claim is debatable or wrong. Thus, we deny a COA on this claim.

Finally, Coble argues that his Eighth and Fourteenth Amendment rights were violated because

the jury was instructed in conformity with TEX. CODE CRIM. PROC. art. 37.071(d) during the sentencing phase. Accordingly, the jury was not told that if any juror voted "no" to any special issue then Coble would have received a life sentence automatically, rather than the death penalty.

The state habeas court found that this claim was procedurally defaulted because Coble's attorney failed to object at trial. We agree.[9] *See, e.g.*, *Coleman*, 501 U.S. at 729-30; *Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996). Even if we were to consider this claim on the merits, it is squarely foreclosed by our precedent. In *Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000), we decided this very issue and held that it was barred by *Teague v. Lane*, 489 U.S. 288 (1989). *Alexander*, 211 F.3d at 897. Thus, with regard to this issue, Coble has not shown that he is entitled to a COA.

For the foregoing reasons, we GRANT Coble's petition for a COA on his claim that the special issue interrogatories and the supplemental instruction given to the jury during his sentencing trial were constitutionally inadequate because they did not provide an appropriate vehicle for the jurors to given effect to Coble's mitigating evidence of mental illness. We AFFIRM the district court's denial of habeas relief and DENY a COA with respect to the other ten issues raised by Coble.

---

[9]Of course, a procedural bar may be overcome, however, if the petitioner can show cause and prejudice, or that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman*, 510 U.S. at 750. Although Coble now argues that the ineffective assistance of his counsel should serve as cause, he has failed to even argue this second prong. Thus, Coble has not shown that the district court's ruling on the procedural ground is debatable.