United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 14, 2007**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

————————

No. 01-50010

————————

BILLIE WAYNE COBLE,

Petitioner-Appellant,

versus

NATHANIEL QUARTERMAN, DIRECTOR, TEXAS
DEPARTMENT OF CRIMINAL JUSTICE, INSTITUTIONAL
DIVISION,

Respondent-Appellee.

————————————————————

Appeal from the United States District Court
For the Western District of Texas

————————————————————

ON PETITION FOR REHEARING

Before JOLLY, GARZA, and STEWART, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

In *Coble v. Dretke*, 444 F.3d 345 (5th Cir. 2006), we affirmed the district court's denial of

a writ of habeas corpus to petitioner Billie Wayne Coble on the grounds that he did not receive

ineffective assistance of counsel at his capital murder trial and that all of his mitigating evidence could

be given effect within the "special issue" interrogatories in the Texas capital sentencing instruction.

Coble filed petitions for panel rehearing and rehearing en banc, in which he challenged our holding

regarding the Texas special issues; he did not challenge our resolution of his ineffective assistance of counsel claims. While his petitions were pending, our en banc court decided *Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006) (en banc), in which a majority held that, with respect to the Texas special issues, the relevant inquiry under clearly established Supreme Court precedent is "whether there was a reasonable likelihood that the jury would interpret the Texas special issues in a manner that precluded it from fully considering and giving full effect to all of the defendant's mitigating evidence." *Id.* at 293. Shortly thereafter, the United States Supreme Court issued two decisions dealing with the Texas special issues: *Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654 (2007), and *Brewer v. Quarterman*, 127 S. Ct. 1706 (2007). In those cases, the Supreme Court confirmed that (1) its precedent "firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future," *Abdul-Kabir*, 127 S. Ct. at 1664, and (2) prior to *Nelson*, our court had "mischaracterized the law as demanding only that [mitigating] evidence be given 'sufficient mitigating effect,' and [had] improperly equated 'sufficient effect' with 'full effect,'" *Brewer*, 127 S. Ct. at 1713. We asked the parties for additional briefing in light of these three cases. Because we are persuaded that there was a reasonable likelihood that the Texas special issues precluded the jury from giving meaningful consideration and effect to Coble's mitigating evidence, we conclude that the Texas Court of Criminal Appeals' determination that the special issues were constitutional as applied to Coble was an unreasonable application of clearly established federal law as announced by the Supreme Court. Accordingly, Coble's petition for rehearing is GRANTED. We WITHDRAW the opinion issued on March 22, 2006 and reported at 444 F.3d 345, and substitute

-2-

this opinion:

I

Petitioner, Billie Wayne Coble ("Coble"), was convicted of capital murder in the state court of Texas and sentenced to death. Based on a Certificate of Appealability ("COA") on two issues, one granted by the district court and one by this court, Coble appeals the district court's denial of federal habeas relief.

Coble was convicted of the capital murders of his brother-in-law, father-in-law, and mother-in-law. The facts of Coble's crimes are set forth in the opinion of the Texas Court of Criminal Appeals ("TCCA") disposing of Coble's direct appeal.

Coble was having marital problems and separated from his wife, Karen Vicha, not long before the murders. Coble kidnaped Karen Vicha at knife-point. He attempted to convince her not to divorce him, but eventually released her unharmed. *Coble v. State*, 871 S.W.2d 192, 195-96 (Tex. Crim. App. 1993) (en banc). Several weeks later, Coble was seen driving around the area where Karen Vicha and her parents lived. *Id*. at 196. That afternoon, he was waiting at his wife's house when her daughters returned from school. Coble handcuffed and tied up her three children and one of their cousins. *Id*. Next, Coble cut the phone lines to the house and went down the street to the house of his brother-in-law, Bobby Vicha. Coble and Bobby Vicha struggled, and Coble ultimately shot Bobby Vicha in the neck. *Id.* at 196-97 & n.6. He returned to Karen Vicha's house for a period of time and then went across the street to the Vicha family home. Coble fatally shot Karen Vicha's parents, Zelda Vicha and Robert Vicha. He cut the phone lines to the Vicha family home as well. *Id.* at 196-97.

When Karen Vicha arrived home from work, Coble was waiting for her. *Id.* at 197. He admitted to killing her parents and brother and told her that Bobby Vicha had shot him. He then handcuffed her and drove her out to a rural area in her car. Karen Vicha later testified that Coble assaulted her during the drive. Coble was eventually apprehended after a brief high-speed pursuit, which ended when Coble crashed into a parked car. At the hospital where Coble and Karen Vicha were taken for treatment, Coble spontaneously told various hospital personnel and police officers that he had killed three people. *Id.*

Coble was subsequently convicted of capital murder. At the close of the penalty phase evidence, the jury answered the special issues in the affirmative and the judge sentenced Coble to death. His direct appeal was affirmed by the TCCA, and the Supreme Court denied his petition for a writ of certiorari. *Id.* at 208, *cert. denied*, *Coble v. Texas*, 513 U.S. 829 (1994).

Coble filed an application for a state writ of habeas corpus, alleging twenty-six claims for relief. The trial court held an evidentiary hearing on five of these claims, but recommended that relief be denied. The TCCA agreed, adopted the trial court's findings of fact and conclusions of law, and denied relief in an unpublished order. *Ex parte Coble*, No. 39,707-01 (Tex. Crim. App. 1999).

Coble then applied for federal habeas relief, and the district court appointed counsel. Coble filed his habeas petition, alleging twenty-five claims, and the district court stayed his execution pending resolution of the petition. The district court denied Coble's request for an evidentiary hearing and denied the writ. The district court did, however, grant COA on the issue of ineffective assistance of counsel. Coble then petitioned for COA from this court on eleven additional grounds. We granted COA on the issue of whether the "special issue" interrogatories in the Texas capital sentencing instruction precluded effective consideration of Coble's mitigating evidence in violation

of the mandates of *Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*"), and *Penry v. Johnson*, 532 U.S. 782 (2001) ("*Penry II*"). *Coble v. Cockrell*, 80 Fed. Appx. 301 (5th Cir. 2003).

II

"In a habeas corpus appeal, we review the district court's findings of fact for clear error and review its conclusions of law de novo, applying the same standard of review to the state court's decision as the district court." *Thompson v. Cain*, 161 F.3d 802, 805 (5th Cir. 1998). Because Coble filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the district court's federal habeas review was governed by AEDPA.

Under AEDPA, habeas relief is not available to a state prisoner

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim ) )
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Under AEDPA, our duty is to determine whether the state court's determination was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court at the time that [Coble's] conviction became final" in 1994. *Nelson v. Quarterman*, 472 F.3d 287, 293 (5th Cir. 2006) (en banc) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is contrary to clearly established Supreme Court precedent if: (1) "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme

Court] precedent." *Williams*, 529 U.S. at 406. A state court decision is an unreasonable application of clearly established Supreme Court precedent if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id*. at 407-08. The inquiry into unreasonableness is objective. *Id*. at 409-10. A state court's incorrect application of clearly established Supreme Court precedent is not enough to warrant federal habeas relief; in addition, such an application must also be unreasonable. *Id*. at 410-12. The state court's factual findings are presumed to be correct, and the habeas petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

III

Coble makes multiple ineffective assistance of counsel arguments. These claims are governed by the familiar standards of *Strickland v. Washington*, 466 U.S. 668 (1984). Coble must establish: (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) that the deficient representation caused prejudice, which requires a showing that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Williams*, 529 U.S. at 390-91 (quoting *Strickland*, 466 U.S. at 688, 694). Our scrutiny of counsel's performance is "highly deferential" and there is a "strong presumption" that any alleged deficiency "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Coble claims trial counsel did not adequately prepare for the sentencing phase of his trial because they failed to interview and prepare the witnesses who testified. In the cases cited by Coble, trial counsel failed to conduct *any* investigation of witnesses who might have provided alibis or who were eyewitnesses. *See, e.g.*, *Bryant v. Scott*, 28 F.3d 1411, 1418 (5th Cir. 1994) ("[Counsel's]

complete failure to investigate alibi witnesses fell below the standard of a reasonably competent attorney practicing under prevailing professional norms."). *See also Rompilla v. Beard*, 125 S.Ct. 2456 (2005) (counsel provided ineffective assistance by failing to examine a file on defendant's prior convictions at sentencing phase of capital murder trial despite knowing the state's strategy was to emphasize defendant's violent character). In this case, Coble concedes that trial counsel's professional investigator interviewed all of the witnesses prior to their testimony. Furthermore, even assuming counsel failed to fully prepare these witnesses, Coble only argues that these witnesses would have been "more effective" if they had been better prepared, which does not come close to suggesting that "but for counsel's errors, the result of the proceeding would have been different." Coble also alleges that trial counsel failed to call favorable witnesses to testify. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)). Coble has not established what information these witnesses would have provided. Based on what can be gleaned from his briefs, these witnesses would have presented testimony already provided by other witnesses.[1] Counsel's decision not to present cumulative testimony does not constitute ineffective assistance. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984). Finally, Coble alleges that counsel was ineffective because they only conducted two interviews of him while he was awaiting trial in prison. There is no support for this assertion in the record. Sheila Thun, a

[1] Coble argues that these uncalled witnesses would have testified regarding Coble's difficult upbringing, his mother's psychiatric problems, his stay in a state home, his Vietnam experiences, and his positive performance as a father and worker. Coble's sentencing witnesses testified about these issues.

deputy of the Sheriff's office who worked in the jail and was responsible for keeping jail records, testified that attorney visitations are not recorded in the same manner as lay visitations. Attorneys were simply required to sign a card that was subsequently destroyed. Coble's trial counsel, Hoagie Karels, also testified that it was not unusual for him to see a client in jail without signing in and that jail visitation records indicating no visits to Coble would be inaccurate. Karels testified that jail-based meetings with Coble occurred whenever necessary and that meetings were also conducted in the courtroom. Based on the information before the state habeas court, its denial of habeas relief was not objectively unreasonable.

Coble also argues that trial counsel failed to present a coherent theory regarding mitigation evidence in order to persuade the jury to answer "no" to the second special issue question.[2] Coble argues that counsel's closing argument was ineffective, counsel ineffectively cross-examined the State's expert on the point of future dangerousness, and counsel should have presented a statistical theory related to whether Coble, as an older man with an extended prison term, represented a continuing threat. Many of the factors that make up this "coherent theory" were presented at trial. For example, counsel presented experts who testified that Coble's actions were impulsive, that he suffered from psychiatric problems, and that he would likely not be a repeat offender. In addition, witnesses testified that Coble had a difficult childhood and tragic experiences in Vietnam, but was a devoted father and diligent worker who contributed to his community. Indeed, counsel presented a coherent theory to support a life sentence: Coble committed a crime of passion, one which he likely

---

[2] In order to sentence a convicted defendant to the death penalty, Texas law requires juries to affirmatively answer two special issues. In this case, the second special issue given at Coble's sentencing was "Is there a reasonable probability that the Defendant, Billie Wayne Coble, will commit criminal acts of violence that would constitute a continuing threat to society?"

would not repeat. At its base, Coble's current challenge is to the strategy employed by trial counsel. Such a challenge does not establish ineffective assistance. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. . . . Judicial review of a defense attorney's summation is therefore highly deferential) ) and doubly deferential when it is conducted through the lens of federal habeas."). Coble's indictment of trial counsel's cross-examination of the State's expert is equally meritless. Coble presented experts who testified that Coble would not be a threat and he challenged the State's expert on recidivism of "passion killers." Coble's desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review. *Johnson v. Cockrell*, 301 F.3d 234, 239 (5th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689) ("[C]ourts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"). We cannot say that the state habeas court's decision was objectively unreasonable.

Coble contends next that trial counsel rendered ineffective assistance during the guilt/innocence phase of the trial by failing to construct a viable insanity or diminished capacity defense. Coble argues that evidence of his mental state, which was extensively developed at sentencing, should have instead been presented at the guilt/innocence phase of trial. In this case, the trial court denied a defense request for an insanity instruction. Trial counsel testified before the state habeas court that the possibility of an insanity defense was investigated. Trial counsel also testified that no expert would support the insanity defense. Coble offered no evidence to the state habeas court that he was insane at the time of the murders. Trial counsel investigated the possibility of

-9-

presenting an insanity defense and opted to hold the evidence until the sentencing phase of trial. Thus, counsel was not ineffective for failing to present an insanity defense at the guilt/innocent phase of trial since no experts would support the defense. *See Wheat v. Johnson*, 238 F.3d 357, 363 (5th Cir. 2001); *Crane v. Johnson*, 178 F.3d 309, 313-14 (5th Cir. 1999); *Williams v. Cain*, 125 F.3d 269, 278-79 (5th Cir. 1997) ("failure to present . . . evidence would not constitute 'deficient' performance within the meaning of *Strickland* if . . . [counsel] could have concluded, for tactical reasons, that attempting to present such evidence would be unwise."). In addition, counsel was not ineffective for failing to present a diminished capacity defense because diminished capacity is not cognizable in Texas. *See, e.g.*, *Jackson v. State*, 115 S.W.3d 326, 328 (Tex. App. )) Dallas 2003). We cannot say that the state habeas court's decision was objectively unreasonable.

Coble also asserts that trial counsel provided ineffective assistance for failing to object to the prosecutor's improper comments during closing arguments. The prosecutor described Coble as "a cold-blooded, merciless, remorseless killer" and Coble argues that "remorseless" refers to Coble's failure to testify at trial. However, the prosecutor never referenced Coble's failure to testify and there was evidence presented at trial that, immediately following the murders, Coble made comments that indicated his lack of remorse. Without some indication that the prosecutor was referring to Coble's failure to testify, rather than Coble's comments indicating a lack of remorse, this argument is meritless. *See Rivera v. Collins*, 934 F.2d 658, 661 (5th Cir. 1991) ("A statement by a district attorney is not manifestly intended to comment on the defendant's silence when there is another plausible explanation."). We cannot say that the state habeas court's decision was objectively unreasonable.

Coble contends next that he received ineffective assistance of counsel because his trial counsel

allowed a defense expert, Dr. Stephen Mark, to testify that Coble would likely be a danger in the future unless he was medicated. Dr. Mark, a psychiatrist, testifed at trial that he examined Coble on more than one occasion and found that he was a violent and suicidal person due to the depression caused by his post-traumatic stress disorder and bipolar disorder. In his testimony, Dr. Mark stated that Coble's psychiatric disorders and his unique history of separation from his mother and previous wives caused a total loss of control. Dr. Mark did admit that timely hospitalization and treatment with mood-stabilizing drugs could have prevented the murders and that Coble's psychiatric disorders could be controlled by medication. Coble points to evidence presented to the state habeas court that indicated his attorneys and expert disagreed over whether the expert informed the attorneys prior to trial regarding his opinion of Coble's future dangerousness. According to the affidavits of Coble's counsel, Ken Ables and Hoagie Karels, they believed that Dr. Mark would testify at trial that Coble would not be a future danger. Ables and Karels acknowledged that they were surprised by Dr. Mark's trial testimony and that the defense would not have called him as a witness had they known what Dr. Mark's testimony would be on the stand. Coble points to Dr. Mark's affidavit in the state habeas hearing that asserts he discussed the case with Ables on at least six occasions. Dr. Mark remarked that the attorneys should not have been surprised by his testimony that Coble might be a future danger if left untreated, therefore making his testimony more favorable to the prosecution. Coble argues that the presentation of this unfavorable expert testimony negated the effectiveness of his defense. The state habeas court concluded that "at most there was a mis-communication concerning the content of [Dr. Mark's] testimony, or a mis-comprehension of the substance of his testimony as it pertained to the issue of future dangerousness and mitigation." The state habeas court was thus presented with two conflicting stories regarding the communication between Coble's

-11-

counsel and Dr. Mark. The court believed Coble's counsel that they expected Dr. Mark to testify favorably for their client, not that they submitted the expert despite being aware of the damaging nature of his testimony. Therefore, the state habeas court concluded that counsel's performance was not ineffective. While the wisdom of trial counsel's decision to submit the expert is debatable, the state court's denial of habeas relief was not unreasonable. *See Emery v. Johnson*, 139 F.3d 191, 197 (5th Cir. 1997) ("The Sixth Amendment does not guarantee criminal defendants the right to error-free representation.").

Furthermore, even assuming that trial counsel's performance fell below an objective standard of reasonableness, Coble does not establish that the result of the proceedings would have been different, as the habeas court also found that there was no prejudice. First, Dr. Mark's expert testimony was not that Coble was absolutely a future danger, but rather that, left untreated, he was a future danger. Second, other evidence suggested that Coble would be a future danger, including the State's expert who testified that Coble constituted a future danger, the horrific nature of the murders, and testimony that Coble was aggressive and violent towards women in the years before the murders. *See Little v. Johnson*, 162 F.3d 855, 860-61 (5th Cir. 1998) ("Deficient performance is prejudicial only upon a showing that but for counsel's errors, there is a reasonable probability that the ultimate result would have been different and that confidence in the reliability of the verdict is undermined."). Accordingly, we find the state habeas court's decision objectively reasonable.

Coble also argues trial counsel was ineffective for admitting into evidence psychiatric reports at the penalty phase which suggested he was a future danger.[3] Coble asserts that trial counsel could

[3] The four exhibits included: (1) a psychiatric report on Coble prepared by Dr. Ralph Hodges, dated May 6, 1964, when Coble was 15 years old; (2) a Veteran's Administration report of a medical examination on Coble by a neuropsychiatrist performed in 1970; (3) a Veteran's Administration rating

have prevented any State attempt to introduce these exhibits because they violated the Confrontation Clause of the Sixth Amendment. However, each of the exhibits that trial counsel introduced satisfied an exception to the hearsay rule,[4] and thus met the requirements of the Confrontation Clause. *See Lilly v. Virginia*, 527 U.S. 116, 124-25 (1999) (hearsay evidence does not offend the Confrontation Clause where the evidence falls within a firmly rooted hearsay exception); *White v. Illinois*, 502 U.S. 346, 356 (1992). Although the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004), held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is . . . confrontation," none of the exhibits submitted during the penalty phase of trial that Coble contests were *testimonial* statements, as discussed in *Crawford*. 541 U.S. at 51-53. Trial counsel's decision to admit these damaging documents before the State was able to introduce them, and soften their potential damage, is a reasonable trial strategy and will not be second guessed. *See Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993) ("Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices."). Therefore the state habeas court's finding regarding this claim was objectively reasonable.

Coble asserts next that trial counsel was ineffective for admitting a 1964 psychiatric report from a doctor's consultation with Coble when he resided at a state home at the age of fifteen. In the report, Coble admitted to several illegal actions. These extraneous offenses were then presented to

_____

decision relating to Coble dated February 20, 1970; and (4) a clinical narrative relating to Coble dated Novermber 22, 1967.

[4] *See* TEX. R. EVID. 803(4) (statements made for purposes of medical diagnosis or treatment); TEX. R. EVID. 803(6) (records of regularly conducted activity); and TEX. R. EVID. 803(16) (authenticated documents over 20 years old).

the jury when the report was introduced as evidence by trial counsel. Coble contends that the state

report violated his Fifth Amendment right to self-incrimination at the time it was taken and that the

admission of the report at the penalty phase of his capital murder trial violated his Fifth and Sixth

Amendment rights, as articulated in *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981). The Supreme

Court held in *Estelle v. Smith* that the state's use, during the penalty phase of a capital trial, of the

testimony of a psychiatrist who performed a court-ordered competency examination on the defendant,

violated the defendant's Fifth Amendment right since the defendant was not warned that the

statements could be used during the penalty phase. We considered and rejected these underlying

claims in Coble's COA application. We found the district court's analysis persuasive, as well as

finding that any *Estelle v. Smith* violation was harmless. *Coble v. Cockrell*, 80 Fed.Appx 301, 312

(5th Cir. 2003). In addition, Coble's claim that the report violated his Fifth Amendment rights in

1964 is meritless because the psychiatric consultation was not a custodial interrogation. *See Miranda

v. Arizona*, 384 U.S. 436 (1966) (conditioning the admissibility at trial of any custodial confession

on warning a suspect of his rights). Coble's statements were simply for the purpose of medical and

psychiatric diagnosis. Unlike the defendant in *Estelle v. Smith*, Coble was not "faced with a phase

of the adversary system," but was "in the presence of [a] perso[n] acting solely in his interest."

*Estelle*, 451 U.S. 467-69. Therefore, the report did not violate his Fifth Amendment right. In

addition, our precedent holds that "[i]f a defendant requests an examination on the issue of future

dangerousness or presents psychiatric evidence at trial, the defendant may be deemed to have waived

the fifth amendment privilege." *Vanderbilt v. Collins*, 994 F.2d 189, 196 (5th Cir. 1993). In this

case, Coble's trial counsel made a strategic decision to admit the 1964 report, before the prosecution,

to soften the blow in the minds of the jury. Coble does not establish that the state habeas court's

resolution of these claims was objectively unreasonable.

Coble claims that cumulative error merits habeas relief. Federal habeas relief is only available for cumulative errors that are of a constitutional dimension. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *Yohey*, 985 F.2d at 229. As previously discussed, none of Coble's ineffective assistance claims establish ineffective assistance under *Strickland*. Coble has not identified errors of constitutional dimension. Accordingly, we cannot say that the state habeas court's rejection of Coble's cumulative error claim was objectively unreasonable.

Coble argues that the facts in his case are indistinguishable from the facts in *Williams v. Taylor*, 529 U.S. 362 (2000), which held that petitioner was denied effective assistance of counsel when his attorneys failed to investigate and present substantial mitigating evidence during the sentencing phase of his capital murder trial. However, there are clear differences between the performance of Coble's counsel at trial and the performance of Williams' counsel. In *Williams*, counsel only prepared for the guilt phase a week before trial, failed to investigate mitigating evidence, failed to introduce evidence that Williams was "borderline mentally retarded," failed to investigate positive evidence regarding Williams' trustworthiness, and failed to contact a favorable witness. *Id*. at 396. The mitigation evidence that Williams' counsel presented was weak, consisting only of the testimony of three relatives who stated that Williams was "a nice boy," and the tape recorded statement of a psychiatrist. *Id*. at 369. Coble's counsel produced a significant number of witnesses who testified regarding his background. These witnesses testified regarding Coble's mother's psychiatric disorders, his time in a state home, his experience in Vietnam, his marriage difficulties, and positive factors related to his work and his children. Counsel also presented two psychiatric expert witnesses who discussed Coble's mental history. Coble concedes there was some investigation of his

-15-

background, but argues there should have been more. Coble offers no explanation of what mitigating evidence further investigation might have revealed. Coble asserts that his trial counsel failed to call witnesses, but he does not explain what these witnesses would have offered separate and apart from the mitigation evidence that was presented. Coble's case is easily distinguishable from Williams' where trial counsel failed to uncover and present evidence relating to Williams' "nightmarish childhood" and that he was "borderline mentally retarded." *Williams*, 529 U.S. at 395-96. The state habeas decision was not contrary to or an unreasonable application of *Williams*.

Similarly, Coble contends that the state court's denial of habeas relief was contrary to clearly established federal law because the set of facts in Coble's case is materially indistinguishable from those in *Wiggins v. Smith*, 539 U.S. 510 (2003), where the Court determined that counsel was ineffective in not investigating petitioner's life history for mitigating evidence beyond the presentence investigation report and the department of social services records.[5] Despite Coble's protests to the contrary, the facts in *Wiggins* are clearly distinguishable from the facts in the instant case. The *Wiggins* Court stressed that "[d]uring the proceedings themselves . . . counsel introduced no evidence of Wiggins' life history." 539 U.S. at 515. The failure to present this evidence was compounded by the fact that Wiggins' counsel failed to investigate Wiggins' background and never attempted to compile his social history. *Id*. at 523 ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*.") (emphasis in original). Unlike in *Wiggins*, Coble's attorneys not only investigated his background,

---

[5] Coble did not set forth his *Wiggins* argument until his reply brief. However, it is understandable that Coble did not address *Wiggins* in earlier briefing before us or the district court because the Supreme Court had not yet issued the opinion. *Wiggins* properly applies to the state court's resolution of Coble's ineffective assistance claims because that decision was not "new law," but rather an application of *Strickland*. *See Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003).

they also offered a mitigation case. In *Wiggins*, the Supreme Court found ineffective assistance of counsel because it was unreasonable to make the decision not to investigate. Here, there is no question that Coble's attorneys investigated his background. At most, Coble is challenging the strategy employed by trial counsel, arguing that witnesses should have been better prepared and that more witnesses should have been proffered. Coble's challenge is measurably distinct from the failure to investigate social history in *Wiggins*.[6]

In sum, Coble's attempts to analogize *Williams* and *Wiggins* fail because counsel is not required to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533.

We also recognize the Supreme Court's recent decision in *Rompilla v. Beard*, in which the Court held "that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." 125 S.Ct. 2456, 2460 (2005). Counsel for Rompilla knew the prosecution's sentencing strategy)) emphasizing his violent character by introducing past felony convictions involving the use or threat of violence)) yet, counsel failed to make reasonable efforts to obtain mitigation evidence, or even examine the file on Rompilla's prior convictions. As discussed *supra*, Coble fails to demonstrate what additional mitigating evidence further investigation by his counsel might have revealed. The Court even distinguished the type of argument presented

---

[6] In addition, Wiggins' unresearched background was appalling. Wiggins' background involved "physical torment, sexual molestation, [ ] repeated rape[,]" a period of homelessness, and diminished mental capacities. *Wiggins*, 539 U.S. at 535. Coble is unable to describe any mitigation evidence that was available, but not investigated.

by Coble from that made by Rompilla, stating that "[q]uestioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt that there is any needle there. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce." *Id*. at 2467. Coble simply argues that his counsel should have called additional witnesses that would have testified regarding the same issues already discussed by other witnesses. The efforts of Coble's counsel are easily distinguishable from counsel's performance in *Rompilla.*

IV

Coble next argues that the jury instructions, specifically the Texas "special issue" interrogatories, submitted during the punishment phase of his capital murder trial, deprived the jury of an effective vehicle to consider mitigating evidence in violation of the mandate in *Penry I* and *Penry II*, thus violating the Sixth, Eighth, and Fourteenth Amendments. To impose a capital sentence under the version of the Texas statute in force when Coble was tried, the jury had to answer two questions in the affirmative. The first special issue interrogatory addressed whether the defendant had acted "deliberately and with the reasonable expectation that the death of the deceaseds or another would result." The second special issue question instructed the jury to consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."[7]

_____

[7] The special issues are set out in TEX. CRIM. PROC. CODE art. 37.071. The third special issue, which is not relevant to the *Penry I/Penry II* analysis, addresses whether the defendant's conduct was a reasonable response to the provocation, if any, of the victim. TEX. CRIM. PROC. CODE art. 37.071(b)(1)-(3) (Vernon 1981). The third special issue was not submitted to the jury despite the objections of Coble's trial counsel.

-18-

Coble's trial was held between the Supreme Court's decisions in *Penry I* and *Penry II*. In *Penry I*, the Court held that the first two "special issue" interrogatories in the Texas capital sentencing instructions, though facially valid, failed to satisfy the constitutional requirement that a capital defendant be able to present and have the jury fairly consider mitigating evidence in certain situations. 492 U.S. at 315, 328. After *Penry I*, Texas trial courts still gave the special issue interrogatories to the jury, but added a supplemental instruction to "cure" any possible *Penry* defect. Eventually, the Texas legislature adjusted the special issues to add a mitigating evidence question. *See Robertson v. Cockrell*, 325 F.3d 243, 248-49 & n.4 (5th Cir. 2003) (en banc) (describing the background of the period between *Penry I* and *Penry II* and detailing the new special issue). Coble's jury, however, received the interim supplemental instruction, as did Penry's jury when his case was retried.

Penry was retried and again found guilty of capital murder and sentenced to death. In *Penry II*, the Supreme Court considered a constitutional challenge from Penry on whether the jury instructions at Penry's resentencing complied with its mandate in *Penry I*. The Court considered the supplemental instruction given at Penry's subsequent retrial,[8] and held that the instruction provided

_____

[8] In its opinion, the Court restated the instruction:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the state or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine,

"an inadequate vehicle for the jury to make a reasoned moral response to Penry's mitigating evidence." *Penry II*, 532 U.S. at 800. Specifically, the Court held that the supplemental instruction potentially created an unacceptable dilemma for the jurors because it instructed the jurors to change one of their truthful "yes" special issue answers to a "no" if they felt the defendant did not deserve the death penalty. Thus, the instructions left the jurors with the choice of either not giving effect to Penry's proffered mitigation evidence or, alternatively, violating their oath as jurors to render a true verdict.[9] *Id.* at 798-801. Coble received a virtually identical supplemental instruction at his trial as that given at Penry's trial.[10]

---

> when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues.

*Penry II*, 532 U.S. at 789-90.

[9] The Supreme Court again held in *Smith v. Texas*, 125 S. Ct. 400 (2004), that substantially similar jury instructions as those provided in *Penry II* were constitutionally inadequate.

[10] The State concedes this fact. In its entirety, the supplemental instruction given at Coble's trial, reads as follows:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider the mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the Defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, and thereafter give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence is an appropriate response to the

-20-

The TCCA nevertheless concluded that the special issues did not preclude the jury from giving effect to Coble's mitigating evidence and were therefore constitutional as applied to him. Coble argues that the TCCA's determination that the special issues provided the jury with an adequate vehicle for giving consideration and effect to his mitigating evidence of mental illness and troubled background was an unreasonable application of *Penry*. In order to grant relief on Coble's *Penry* claim, we must first determine whether his mitigating evidence of mental illness and troubled background satisfied the "low threshold for relevance" articulated by the Supreme Court. *Tennard v. Dretke*, 124 S. Ct. 2562, 2570 (2004).[11] If so, we must determine whether there was a reasonable likelihood that the jury applied the special issues in a manner that precluded it from giving meaningful consideration and effect to all of Coble's mitigating evidence. *See Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654, 1664, 1668 n.14 (2007); *Brewer v. Quarterman*, 127 S. Ct. 1706, 1710, 1713 (2007); *Nelson*, 472 F.3d at 293, 315-16.

A

In *Tennard*, the Supreme Court held that "a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less

---

personal culpability of the defendant, a negative finding should be given to one or more of the special issues under consideration.

[11] Coble's *Penry* claim must be considered in light of the Supreme Court's decisions in *Tennard* and *Smith v. Texas*, 125 S. Ct. 400 (2004), which significantly altered our circuit's analysis of mitigating evidence offered by a defendant in a capital case. Before *Tennard* and *Smith*, *Penry*-type mitigating evidence was determined by the stringent test articulated in *Graham v. Collins*, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), *aff'd*, 506 U.S. 461 (1993), and readopted in *Robertson v. Cockrell*, 325 F.3d at 251. To qualify, mitigating evidence had to be "due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own." *Robertson*, 325 F.3d at 251 (quoting *Graham*, 950 F.2d at 1029). In addition, the criminal acts of the defendant had to be attributable to the severe permanent condition. *Id*. at 252.

-21-

than death . . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." *Tennard*, 124 S. Ct. at 2570 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)). The Court defined relevant mitigating evidence as "evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Id.* (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990) (defining relevant mitigating evidence in the most expansive terms)). Furthermore, the Court added that "a State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find it warrants a sentence less than death.'" *Id.* (quoting *McKoy*, 494 U.S. at 440).

During the sentencing phase of his trial, Coble offered a variety of mitigating evidence. First, he presented non-psychiatric mitigating evidence, including evidence of his troubled childhood; that his father died before he was born; that his mother suffered a nervous breakdown when he was eleven; and that he was sent to live at a state facility. Coble lived at the orphanage until he was seventeen, at which point he joined the Marines and served in Vietnam. During his four years of service, Coble served as a machine gunner and was involved in combat. Upon his return to the United States, Coble was hospitalized due to the trauma he experienced during the war. Likewise, Coble's sister testified that he was different after he returned from Vietnam. Coble offered testimony that he was involved with various youth programs over the years, that he had a good relationship with his son, and that he got along well with co-workers. Coble also served as a section leader in the U.S. Army reserves, and he offered evidence that he was well respected.

Coble also presented the testimony of two psychiatrists. The first, Dr. Mark, testified that Coble was dangerous and might continue to be a danger. In fact, Dr. Mark testified that everything in Coble's history would make him a continuing threat. Dr. Mark also testified that Coble suffered

-22-

from two psychiatric disorders: post-traumatic stress disorder, brought about by his Vietnam experiences, and bipolar disorder. He stated that Coble was prone to become "[p]otentially explosive and potentially aggressive and assaultive," and suggested that the bipolar disorder might be hereditary. Dr. Mark also indicated that these illnesses made Coble susceptible to severe mood swings, which resulted in a loss of control on the day of the murders.[12]

Dr. Mark did, however, indicate that Coble would be less likely to be violent if he took medication. In fact, Dr. Mark indicated that, had he known before the murders of Coble's past and the depression Coble was experiencing because of the pending divorce and kidnaping charges, he would have recommended hospitalization for further treatment and evaluation. Dr. Mark also conceded that if Coble refused to take medication he would probably be violent in the future.

Dr. James Grigson, the second defense expert, testified that Coble was suffering from severe depression at the time of the murders, and that it was very improbable that Coble would commit this type of offense again. Specifically, Dr. Grigson stated that Coble was more horrified by the pictures of the victims than anyone, and that Coble had feelings of remorse and guilt. Both psychiatrists agreed that Coble linked the loss of his wives with the loss of his mother, such that the divorces triggered severe bouts of suicidal depression. Dr. Grigson also discussed a 1964 psychiatric report, created by Dr. Ralph Hodges, which classified the fifteen-year-old Coble as having a "sociopathic personality disturbance of the dissocial type." Dr. Grigson stated that the term "sociopath" did not mean the same thing in 1964 as it does now, and that a diagnosis of an individual as a sociopath could

---

[12] Coble does not contend that his mental illness exempts him from the death penalty under either *Ford v. Wainwright*, 477 U.S. 399 (1986) (holding that Eighth Amendment prohibits executing the insane), or *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that Eighth Amendment prohibits executing the mentally retarded).

not be made until a person was eighteen years old.[13]  He concluded that Coble "was not a sociopath then, and not a sociopath now."[14]

Applying the low threshold articulated in *Tennard,* it is clear that the evidence submitted by Coble constitutes relevant mitigating evidence.  All of Coble's evidence is mitigating in the sense that it might serve as a basis for a sentence less than death.  *See Tennard*, 124 S. Ct. at 2570. Accordingly, Coble's evidence has satisfied the first prong in determining whether he is entitled to habeas relief on his *Penry* claim.

B

"Once this low threshold for relevance is met, the 'Eighth Amendment requires that the jury be able to consider and give effect to' [the] defendant's mitigating evidence."  *Id.* (quoting *Boyde v. California*, 494 U.S. 370, 3770-78 (1998)).  As the Supreme Court explained in *Abdul-Kabir*, "sentencing juries must be able to give *meaningful* consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir*, 127 S. Ct. at 1664 (emphasis added).[15]  This requirement is not satisfied when the jury

---

[13] Dr. Hodges did not define the term "sociopath" nor did Dr. Grigson explain in his testimony the difference between the current meaning of the term compared to its meaning in 1964.

[14] To rebut the psychiatric testimony, the State presented Dr. Richard Coons who testified that, based on Coble's history of emotional instability and violence, there was a probability that he would continue to be dangerous in the future.  In making this determination, Coons relied heavily on the 1964 report.

[15]  According to the State, the "meaningful effect" standard articulated by the Supreme Court in *Abdul-Kabir* and *Brewer* differs from the "full effect" standard articulated by our en banc court in *Nelson*.  *Compare Abdul-Kabir*, 127 S. Ct. at 1664 ("[S]entencing juries must be able to give *meaningful* consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual") (emphasis added), *with Nelson*, 472 F.3d at

-24-

is unable to express a "reasoned moral response to evidence that has mitigating relevance beyond the scope of the special issues." *Nelson*, 472 F.3d at 293. "[A] juror cannot be precluded from electing a sentence less than death if he believes that the mitigating evidence offered makes the defendant less morally culpable for the crime, even if he nonetheless feels compelled to answer the two special issues in the affirmative." *Id.* Therefore, "when the defendant's evidence may have meaningful relevance to the defendant's moral culpability 'beyond the scope of the special issues,'" a special instruction is required. *Abdul-Kabir*, 127 S. Ct. at 1668 n.14.

The question for us, then, is whether Coble's mitigating evidence had meaningful mitigating relevance beyond the scope of the two special issues, such that a special instruction was required. We conclude that it did. Because there is a reasonable likelihood that the that jury was precluded from giving full effect to Coble's mitigating evidence, we hold that the TCCA's determination to the contrary was an unreasonable application of clearly established federal law as determined by the Supreme Court.

1

The first special issue, as discussed *supra*, asked the jury to determine whether the defendant

298 ("The Constitution requires a court to determine whether the special issues *as applied* enable the sentencer to give *full* consideration and *full* effect to the capital defendant's mitigating evidence.") (emphasis in original). Therefore, the State argues, we are bound to apply the meaningful-effect rule of *Abdul-Kabir* and *Brewer* rather than the full-effect standard of *Nelson*. We disagree with the premise of the State's argument. Regardless of the descriptor attached to it, the substance of the standard articulated in *Abdul-Kabir/Brewer* and *Nelson* is the same) ) when deciding whether to sentence a defendant to death, jurors must be able to give a reasoned moral response to evidence that has meaningful mitigating relevance beyond its ability to negate the special issues, particularly evidence which speaks to a defendant's moral culpability. *See Abdul-Kabir*, 127 S. Ct. at 1668 n.14, 1669 n.16, 1670; *Brewer*, 127 S. Ct. at 1709, 1712-13; *Nelson*, 472 F.3d at 293, 303. Such evidence must "be permitted its mitigating force beyond the scope of the special issues." *Abdul-Kabir*, 127 S. Ct. at 1670.

had acted "deliberately, and with the reasonable expectation that the death of the deceaseds or another would result."[16] Although Coble's evidence of mental illness and a troubled background may have been relevant to the question of whether he acted deliberately, such that the jury may have been able to give some effect to that evidence through the first special issue, the evidence also had meaningful mitigating relevance beyond its tendency to disprove that Coble acted deliberately. Specifically, "a reasonable juror could have concluded that, while the murder[s] w[ere] deliberate, [Coble] was less morally culpable as a result of his [post-traumatic stress and bipolar disorders and troubled childhood] than a murderer without such a mental illness and similar upbringing might have been." *Nelson*, 472 F.3d at 306. Because the deliberateness special issue did not enable the jury to give effect to such a conclusion, the special issue did not provide the jury with a vehicle for expressing its reasoned moral response to a "major mitigating thrust" of Coble's evidence. *Id.* ("Because a major mitigating thrust of evidence of a mental disorder and an abusive childhood is that such afflictions could reduce an offender's moral culpability, it is 'reasonably likely' that a jury would not have been able to give full effect to his 'reasoned moral judgment' regarding the full mitigating impact of Nelson's evidence through the narrowly worded deliberateness instruction.").

2

The second special issue, as discussed *supra*, instructed the jury to consider "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." As with the first special issue, Coble's evidence of mental illness and

___

[16] In addition, the court instructed the jury that "'deliberately' has a meaning different and distinct from the word 'intentionally' as that word was previously defined in the charge on guilt and the word 'deliberately' as used in the first special issue means a manner of doing an act characterized by or resulting from careful consideration, a conscious decision involving a thought process which embraces more than mere will to engage in the conduct."

troubled background may have had mitigating relevance to the question of whether Coble would pose a future danger to society. With respect to his mental illness, there was at least some evidence introduced at Coble's trial that his post-traumatic stress and bipolar disorders were amenable to treatment. Based on this evidence, the jury might have concluded that Coble, if properly treated, would be less likely to commit criminal acts constituting a continuing threat to society. Similarly, the jury might have reasoned that as Coble aged and became more chronologically removed from his difficult childhood and traumatic experiences in Vietnam, his troubled background would exercise a lesser degree of influence over his actions, thereby rendering him less of a future danger. In other words, it is conceivable that the jury could have given some effect to Coble's mitigating evidence through the future dangerousness special issue.

It is equally conceivable, however, that, based on the evidence introduced at Coble's trial, the jury could have concluded that successful treatment of his mental illness was unlikely and that his troubled past increased, rather than diminished, his potential for future violence. Despite concluding that Coble's mental illness and troubled background made him likely to be dangerous in the future, the jury nonetheless might have believed that this same mitigating evidence rendered Coble less morally culpable for the murders and, hence, deserving of a sentence less than death. Much like the deliberateness special issue, the future dangerousness special issue would not have allowed the jury to give effect to such a conclusion. *See Nelson*, 472 F.3d at 312 ("If the jury concluded that Nelson was likely to be dangerous in the future based on his mental disorder and abusive childhood, but also concluded that this evidence rendered him less morally culpable, it had no way to give effect to the mitigating aspect of that evidence through the two special issues."). Thus, the future dangerousness special issue also failed to provide the jury with a vehicle for expressing its reasoned moral response

to a major mitigating thrust of Coble's evidence. *Id.* at 309 ("[B]ased on the principles announced in *Penry I* and its progeny, the future-dangerousness special issue, like the deliberateness special issue, provided a constitutionally insufficient vehicle to allow a jury to express its reasoned moral response and give full effect to Nelson's mitigating evidence.").

3

"At the time [Coble's] conviction became final, the Supreme Court had clearly established that the relevant inquiry is whether there was a reasonable likelihood that the jury would interpret the Texas special issues in a manner that precluded it from fully considering and giving full effect to all of the defendant's mitigating evidence." *Id.* at 315-16. For the foregoing reasons, it is clear that Coble's evidence of mental illness and troubled background had meaningful mitigating relevance beyond the scope of the two special issues. Although Coble's evidence was relevant to the special issues, and the jury may therefore have been able to give partial effect to that evidence in answering the special issues, we conclude that there is a reasonable likelihood that the jury was unable to give meaningful consideration and effect to a major mitigating thrust of Coble's evidence) ) its tendency to make him less morally culpable for his crimes) ) through the special issues. The TCCA's holding to the contrary was an unreasonable application of clearly established federal law as determined by the Supreme Court. Accordingly, Coble is entitled to habeas relief on his *Penry* claim.

V

For the foregoing reasons, we AFFIRM the district court's denial of habeas relief on Coble's claim that he was denied ineffective assistance of counsel at the guilt/innocense and sentencing phases of his capital murder trial, but we REVERSE the district court's denial of habeas relief on Coble's claim that the Texas special issues were unconstitutional as applied to him. Accordingly, we

-28-

REMAND the case with instructions to grant a writ of habeas corpus based on this latter claim.