# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-70037

United States Court of Appeals
Fifth Circuit

**FILED**
March 16, 2017

Lyle W. Cayce
Clerk

BILLIE WAYNE COBLE,

> Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

> Respondent – Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 6:12-CV-39

Before STEWART, Chief Judge, JOLLY, and DENNIS, Circuit Judges.

PER CURIAM:*

Billie Wayne Coble, sentenced to death for the murders of his third wife's parents and brother, requests a certificate of appealability (COA) to appeal the district court's denial of federal habeas relief. We GRANT a COA for two of his claims and deny a COA for the remaining claims.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-70037

## I. Facts and Procedural History

The Texas Court of Criminal Appeals (TCCA) summarized the evidence presented at trial as follows:

> Karen Vicha was [Coble's] third wife. They were married in July 1988 and lived in a house down the road from her brother and across the street from her parents. [Coble] was almost forty years old. The marriage quickly disintegrated,[1] and after a year, Karen told [Coble] to move out. She wanted a divorce. [Coble] attempted to talk her out of this decision and would randomly call her and show up at her work place.
>
> [Coble] then kidnapped Karen as a further effort to dissuade her from divorcing him. He hid in the trunk of her car while she was at a bar one evening with a girlfriend. When Karen started to drive home, [Coble] folded down the back seat and "popped out of the trunk with a knife." He jumped over the console, halfway into the front seat, and stuck the knife against Karen's ribs. He told her to keep driving until they came to a field. Karen stopped the car, and [Coble] said that if he couldn't have her, then no one else could. He pulled out a roll of black electrical tape, but Karen kept talking, and, after about two hours, she convinced him that she would reconsider the divorce issue. He let her go, and she called her brother, Bobby, who was a police officer. Bobby told Karen to report the kidnapping.
>
> After he arrested [Coble] for kidnapping Karen, Officer James Head looked in his patrol-car mirror and saw [Coble] staring at him with a look that "made the hair on the back of [his] head stand up." He got "the heebie-jeebies." [Coble] muttered something like "They're going to be sorry." Officer Head called Karen's brother, Bobby, and warned him about [Coble]. When [Coble] was released on bail for the kidnapping charge, Bobby got Karen a German shepherd for protection. A few days later, [Coble] told Karen, "oh, I see you—you've got a dog now . . . [T]hat's a big mean dog you've got." Shortly thereafter, Karen found the dog lying dead in front of her house.

---

[1] Karen was worried by [Coble]'s sudden personality switches from calm to aggressive—"agitated and angry"—as well as his interest in watching young girls.

2

No. 15-70037

Nine days after he had kidnapped Karen, [Coble] went to her house in the early afternoon. As Karen's three daughters each came home from school along with Bobby's son,[2] [Coble] handcuffed them, tied up their feet, and taped their mouths closed. Karen's oldest daughter testified that she heard [Coble] cut the telephone lines. Then he left to ambush and shoot Karen's father, mother and brother Bobby as each of them came home.[3]

[Coble] returned to Karen's house after the triple killings and waited for his wife to come home from work. He told the children, "I wish I had blown you away like I intended to." When Karen arrived, [Coble] came out of one of the bedrooms with a gun. [Coble] said, "Karen, I've killed your momma and your daddy and your brother, and they are all dead, and nobody is going to come help you now." She didn't believe him, so [Coble] showed her Bobby's gun lying on the kitchen table and pulled the curtains so she could see her father's truck parked behind the house. He showed her $1,000 in cash that he had taken from her mother. [Coble] told Karen that she was lucky that he hadn't molested her daughters, and he told her to kiss them good-bye. She did. He made her put on handcuffs. Karen talked [Coble] into leaving the house and taking her with him.[4] He said he was going to take her away for a few weeks and torture her.[5]

---

[2] All four children, ages 16, 14, 11, and 10, testified that they had liked [Coble] prior to the murders.

[3] Karen's father, the first victim, was found inside his home, covered with blankets and towels. Karen's mother was found in her garage. Bobby was found in his car in his garage. Later that day, [Coble] told Karen that her brother was tough. "He put up one hell of a fight . . . I chased him down the road one way, and I chased him back. And then I shot him, and he was going for the gun in his car. And he wouldn't die . . . So, finally, I had to blow a hole that big in his neck." [Coble] also told Karen that he "really hated to do that to your mom. But when she found out about your dad, she just went crazy."

[4] While Karen and [Coble] were still at her house, Bobby's girlfriend dropped by and saw Karen in handcuffs. She then went to Bobby's house and called Karen's uncle to tell him about seeing Karen in handcuffs. After that call, she looked around Bobby's house and saw blood everywhere, plants and furniture up-ended, and general disarray. She called the sheriff's office. Officers then came to Karen's house, talked to the four children, found the bodies of the three victims, and started the hunt for [Coble].

[5] Karen testified that when she came to a court hearing in 1998, [Coble] kept turning around and smiling at her with "a wicked evil grin." Even in

3

No. 15-70037

As [Coble] drove, Karen tried to escape by freeing one hand from the handcuffs and grabbing at the steering wheel, making the car swerve into a ditch. She grabbed one of [Coble]'s guns, pointed it at his stomach, and pulled the trigger, but nothing happened. Then Karen and [Coble] fought over the gun, with [Coble] repeatedly pulling the trigger, but still the gun did not fire. [Coble] pistol-whipped Karen until she couldn't see for all of the blood on her face. A woman passerby started shouting at [Coble], "[W]hat are you trying to do to that woman," so [Coble] drove the car out of the ditch as Karen lay in the passenger seat. He shouted at her that if she got blood on his clothes, he would kill her. But he was also rubbing her between her legs as he drove. He told her that his reputation was ruined because she had had him arrested and his name was in the papers.

He drove to a deserted field in Bosque County where he threatened to rape her. After dark, he drove out of the field, but they passed a sheriff's patrol car which turned around to follow them. [Coble] grabbed a knife and started stabbing Karen's chin, forehead, and nose, as he was driving. [Coble] said that he did not want to die in prison, so he "floored it" and rammed into a parked car. After the crash, [Coble] turned to Karen and said, "I guess now you'll get a new car." Both [Coble] and Karen were injured in the crash. Officers had to cut the car door open to get Karen out. [Coble] was found with Karen's father's watch and wallet, as well as .37 and .38 caliber revolvers.

*Coble v. State*, 330 S.W.3d 253, 261–63 (Tex. Crim. App. 2010).

Coble was convicted and sentenced to death. His conviction and sentence were affirmed on direct appeal. *Coble v. State*, 871 S.W.2d 192 (Tex. Crim. App. 1993). His initial state habeas application was denied. *Ex parte Billie Wayne Coble*, No. 39,707-01 (Tex. Crim. App. 1999).

The district court denied Coble's petition for federal habeas relief. This Court reversed and ordered a new trial on punishment, holding that there was a reasonable likelihood that the special punishment issues (which at that time

2008, she was still scared of him and felt that he was a continuing threat to her.

4

did not include a special issue on mitigation) did not permit the jury to give meaningful consideration and effect to Coble's mitigating evidence of mental illness and troubled background. *Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007).

Russell Hunt, Jr. and Alexander Calhoun were appointed to represent Coble for the punishment retrial, which was held in September 2008. The following evidence was presented at the 2008 retrial.

Pamela Wooley, Coble's first wife, testified that she married Coble in 1970, when she was 20 years old. She had been married twice previously. Coble was nice to her and their marriage went well in the early years. Coble adopted her daughter from her first marriage and was a good parent to her. They had a son, Gordon Coble. While she was pregnant, Coble told her that if the baby was not a boy, he would not bring her home from the hospital and would leave her. During the latter part of their marriage, Coble became possessive and then abusive. He hit her with an open hand and with his fist, but was remorseful afterward and asked for forgiveness. She also testified that Coble threatened to kill himself in an attempt to get her to change her mind about the divorce, and attempted to commit suicide at the courthouse during their divorce proceedings; and that she filed an assault charge against him after he threw a baseball and hit her in the back. She testified that he got into a fight with another man at work, and told her that he took a hammer and tried to kill the man after the man attacked him.

Patricia Wooley, Pam's younger sister, testified that in 1970, when she was 13, Coble caressed her upper thigh while she was in the back seat of a car with him. In 1972 or 1973, he tickled her "outside" of her clothing. While swimming in a lake when she was 16, Coble touched her between her legs. When she was 17 or 18, Coble opened the glass doors when she was taking a shower and made lewd comments about her body. At the time of Coble's

No. 15-70037

divorce when he was attempting to pick up his son, he hit her, causing a "busted lip." She admitted that she had not told anyone about these alleged incidents until after Coble had been convicted.

Christy Smith testified that in 1973, when she was 13 years old, Coble touched her breast and put his hand between her legs while teaching her to water-ski. She did not tell anyone about the incident at the time, and admitted that she continued to baby-sit for the Cobles after the incident.

Terry Ferguson testified that in 1974 or 1975, when she was 12 to 14 years old, she went to Coble's home to apologize for not going water skiing with him. He tried to touch her around her shoulders and breasts. He backed off after she said she was going to scream. Later, she applied for and got a job at the drive-in movie theater where Coble and his wife worked. Coble tried to do the same things to her two or three other times.

Amy Loreis Ivey Zuniga, Coble's niece, testified that Coble was a model father figure as she was growing up. However, when she was 15, Coble came by her apartment to pick up her brother for work. He saw her sitting in a chair and spread her legs with his hands and made licking motions with his tongue. Later that day he returned, grabbed her, and started trying to kiss her. Then he stopped, threw her a five-dollar bill, said he was sorry, and left. She told her mother about the incident, but nothing was done. The following year, Coble told her that no one believed her and that she should stop telling stories. Later, in 1989, Coble watched her through a window as she was getting dressed.

Phillip Pierce, an administrator in the McLennan County Criminal District Attorney's Office, summarized Coble's military history with the Marine Corps. Coble enlisted in September 1965 and served as a rifleman and machine gunner in Vietnam. His active service ended in 1971 and his character of service was listed as honorable.

6

No. 15-70037

Michael Trantham, a retired Waco police officer, testified that in July 1989, Bobby Vicha brought Karen to talk to him after Coble had kidnapped her and held her at knifepoint. He asked Karen if she wanted to file charges against Coble and she said yes, so an arrest warrant was issued for false imprisonment. The case was presented to a grand jury, which indicted Coble for kidnapping on August 24, 1989.

Candy Ryan, Coble's second wife, testified that their marriage went really well the first year, but then he became physically violent and controlling. He threw a sledgehammer at her and hit her elbow. He usually hit her on the back or side of the head so that bruises would not be visible. These episodes occurred every three to five months, but they had a lot of fun between the episodes of violence, as long as things were going his way. A co-worker once had to call the police after Coble came to her workplace and accused her of running around on him. She left him in August 1987 after he slammed her head up against the cabinet, floor, and counter. He stalked her and called her in the middle of the night. He also threatened to kill her dog.

Neomi Rodriguez testified that she worked at a toy store, where Coble purchased toy handcuffs a few days before the murders. When she testified at his first trial, he stared at her intensely and made a gesture with his finger going across his throat, which she interpreted as a threat.

James Head, a Waco Police detective, testified that he arrested Coble for false imprisonment on August 4, 1989. While driving Coble to the jail, he watched Coble in the rearview mirror. Coble was staring at him and it made the hairs on the back of his neck stand up. As they were walking into the jail, Coble said under his breath that "they're going to be sorry" or "somebody's going to pay." Head later warned Bobby Vicha to watch out because he felt that Coble was dangerous and was going to go after Bobby.

7

No. 15-70037

Karen Vicha's daughters, Anne Marie Tidmore, Tracy Tidmore Habern, and Heather Moss, described how Coble waited for them and their cousin, J.R. Vicha, to come home from school on the day of the murders and then held them at gunpoint, handcuffed them, taped their mouths, and tied them to the bed with curtain cords while he went and murdered their grandparents and uncle. Coble told them he was going to take their mother away and they would not see her again. They said that Coble talked about Vietnam during the ordeal. All three of them testified that they were still scared of Coble.

J. R. Vicha, who was 11 years old in August 1989, testified that he accompanied his cousins when they came home from school on the afternoon of the murders. He described how Coble knelt down beside him and asked his age, and then told him he should be grateful that he had known his dad for 11 years, because that was longer than Coble had known his father. After Coble returned from killing Bobby Vicha, he bragged about being on the television show, "America's Most Wanted."

Michael Voss, who was dating Anne Marie Tidmore at the time of the murders, described going to her home on the afternoon of the murders. Her mother, Karen Vicha, answered the door and told him that Anne Marie was grounded. She had been crying and seemed to be frightened. He went to a friend's house and called Anne Marie, but no one answered. He and his friends went back to the house and knocked on the door. Karen came to the door, crying, and told them that Anne Marie had gone to town with a friend. Knowing that something was amiss, they went to a store to call the police. When they returned to Karen's home, they went inside and found her daughters and J.R. handcuffed and bound.

Karen Vicha testified about her relationship with Coble, the incident that led to the kidnapping charge against him, the death of the dog her brother had bought for her protection from Coble after the kidnapping, and the details

8

of the events on the day of the murders. She testified that Coble had the same "weird evil grin" in court that day that she had seen in the courtroom in 1998.

Robert Brennand, a Bosque County deputy sheriff who followed Coble in the ambulance to the hospital after he was arrested, recorded what Coble said in the hospital. The tape was played for the jury.

The State presented testimony from a firearms expert, and a medical examiner testified about the autopsies of all three victims. V. R. Price, Jr., who took photographs as part of the crime scene investigation, testified that the way John Vicha's body was covered and arranged was similar to a field dressing that a person might do in a military operation.

Dr. Ralph G. Hodges, a psychiatrist, read to the jury his report from his psychiatric consultation with Coble in 1964, when Coble was 15 1/2 years old and living in the Corsicana State Home. Coble and his brother and sister were admitted to the home when Coble was 11 1/2 years old, after their mother was hospitalized. Coble told Dr. Hodges that he stole the ball bearings from other children's bicycles so the wheels would not turn. Coble explained that he did it because he did not have a bicycle. Coble also admitted to several thefts and burglaries. Throughout the interview, Coble seemed extremely hostile to women, made very deprecating remarks about them, and seemed to have a very low opinion of them. Coble recounted beating up a young girl in the classroom, and explained that he did not like her because she had said something smart to him. Coble seemed to be impulsive, had poor controls, very low self-esteem, and seemed to hold other people responsible for his own actions. It was Dr. Hodges's impression at the time that Coble had a sociopathic personality disturbance of the dissocial type and that the long-term prognosis did not look good.

Dr. Hodges testified that after he made this diagnosis, the Diagnostic and Statistical Manual was revised to provide that character disorders were

not diagnosable before age 18. The diagnosis under the revised edition would have been conduct disorder, which describes an individual who is extremely self-centered and concerned about gratifying his own wishes, with little regard for the cost in terms of money or pain inflicted on others.

On cross-examination, Coble's counsel elicited testimony that Coble's half-sister, Dora Jean, who was 10 years old and the daughter of Coble's mother and stepfather, stayed at home with her parents while the three other Coble children were sent to the orphanage. Coble's biological father died three months before he was born, and his mother had a fourth grade education. The family lived in a poor neighborhood and the home was in poor repair. Coble's mother was mentally ill and had a nervous breakdown in 1953 following the death of her sister.

Dee Smith, a prison guard and property officer, identified property taken from Coble's cell. It included photographs of young girls engaged in gymnastic activities. Those photographs were admitted into evidence.

Lorna Sawyer, Coble's cousin, testified that in 1979, when she was 16 years old, Coble offered her a job at the drive-in theater concession stand where he worked. She worked there three weeks. One day when he came to pick her up for work, they went to his house. She said she did not remember what happened, but knew that she was about to be raped. She did not go to the police and did not testify at Coble's first trial.

Dr. Richard E. Coons, a psychiatrist, testified in response to a lengthy hypothetical question that there is a probability that Coble would be a continuing threat to commit criminal acts of violence that would constitute a danger to society. On cross-examination, he admitted that his opinion was the same when he testified in the first trial 18 years earlier. He also acknowledged that the hypothetical question did not include any acts of violence committed by Coble during the 19 years he had been in prison prior to the retrial. On

redirect examination, the prosecutor showed Dr. Coons the photographs of young girls that were found in Coble's cell, and Dr. Coons testified that it was his opinion that Coble's interest in young girls continues.

Joy Howard Marvin was called as a witness by Coble. She was the office manager for a company that sold disability and life insurance. Coble interviewed for a position in March 1989. He was hired and worked there for about three months. She was shocked when she heard about the murders because she knew him as peaceful, well-behaved, and friendly. Marvin's husband, Thomas, testified that he never saw Coble get aggressive with anyone and that Coble did not seem like a violent person. He maintained contact with Coble after Coble went to prison, and testified that Coble has become very involved with his Christian faith.

Janine Swindler, Coble's first cousin, testified that Coble was "real fun" when she was young, but that he was "different" when he returned from the Vietnam War. She had maintained contact with him while he had been in prison and assisted him in purchasing commissary items for other inmates. She also described his efforts to organize tournaments and contests for the inmates. The inmates made Christmas ornaments that he sent to her and asked her to give to first grade students. She visited Coble at the Ellis Unit and observed mutual respect between him and the guards.

Swindler testified that her sister, Lorna Sue Sawyer, has a reputation among family members for being untruthful; that Sawyer had used LSD often in 1979; and that Coble was one of 50 or 100 men Sawyer claimed had sexually assaulted her. On cross-examination by the prosecution, she admitted Sawyer had told her that Coble fondled her and that she had told the State's investigator that she believed Sawyer. She also admitted that she knew Coble had abused his first wife, Pam; that she believes he is a danger to other people, women especially; and that he needs to spend the rest of his life in prison.

No. 15-70037

Dr. Joseph Bond Browder, medical director for the McLennan County Jail, testified that Coble would be 60 years old the following week, that he had a heart attack in 2004, and that he was on medication for hypertension, high cholesterol and heart disease.

Martin Draughon, an inmate who was on death row with Coble from June 1999 – April 2006, testified that Coble was well liked, upbeat, and happy. He had never seen Coble angry or violent. Coble interacted well with prisoners and guards. When they were at the Ellis Unit, they worked in the garment factory. They used sewing machines, cut stacks of fabric with motorized knives, and used scissors and shears, as well as tools to work on the machines. He described Coble's efforts to organize sports tournaments and his work as a reporter for the prison newspaper. Coble helped illiterate prisoners read their mail and write letters to family and friends. After they moved to the Polunsky Unit, they were locked in their cells most of the day, but Coble had the same reputation for being peaceful that he had at the Ellis Unit.

Antonio Barrientes, a convicted murderer, testified that he met Coble on death row at the Ellis Unit in 1990. Coble tried to help inmates who were agitated and getting in trouble. Coble was peaceful and had a good reputation at the unit. He never saw Coble act aggressively toward any of the guards or inmates. Coble worked in the garment factory and then got a job as a trustee, helping the officers feed the inmates and clean the day rooms. They made crafts and had access to knitting needles and razor blades. Coble made clocks for other inmates who lacked resources and helped other inmates obtain items from the commissary.

Don Youngblood, a private investigator for the defense for Coble's first trial, narrated films from the Department of Defense to show the conditions that Coble experienced in Vietnam in 1966–67.

12

No. 15-70037

Mariano Rosales, an inmate at the Polunsky Unit, testified that he worked with Coble in the garment factory at the Ellis Unit. Coble never threatened anyone, obeyed the rules, minded his business, helped the younger offenders, shared his commissary with other inmates, and interacted well with the guards.

Bernardo Tercero, a death-sentenced capital murderer, testified that Coble helped him learn how to speak and read English. Coble taught other inmates how to behave, and took a particular interest in the intellectually disabled inmates. Coble did not get angry easily and was known for his respect for the law and for God.

The defense presented an affidavit of Joni White, Chairman of Classification and Records for TDCJ, to show that Coble had no disciplinary records for his entire period of incarceration.

Mary Oller, Coble's older sister, testified that their father died before Coble was born. Their stepfather was an alcoholic and their mother suffered from mental illness. They lived in impoverished circumstances. After their mother was hospitalized, she and Coble and their brother were sent to the Corsicana State Home. Coble and his brother resented the fact that their stepsister, Dora, remained at home with her parents. Coble was seven or eight years old at the time, and he remained at Corsicana until he was about 17 years old. Coble enlisted in the Marines when he was 17 years old, and had his 18th birthday on the ship to Vietnam. She and Coble exchanged letters while he was in Vietnam. When he returned, he was different; she did not see him smile. He joined the Army Reserve after he left the Marines. In 1989 he completed an Army Reserve instructor training course and traveled around the country to do Army Reserve training exercises. Coble loved his son, G.W., and his stepchildren. He was involved in coaching their sports games and was very

13

active in the community. He also served on the board of the Corsicana State Home ex-students association.

Oller testified that Coble came to live with her after he and Karen separated. He was sad and seemed depressed. He had been charged with kidnapping and needed money for bail and a lawyer. He started talking about Vietnam, which he had never done previously. He also talked about killing himself. A few days before the murders, he called Karen's father and tried to give Mr. Vicha a Mustang that he had been working on. Mr. Vicha laughed at him and told him they would get the Mustang and Coble, too. He threw many of his prized possessions into the dumpster. He stopped eating and began talking about a dog that he no longer had. She feared he was planning to take his own life. On the weekend before the murders, he started calling her by a name he had called her when he was a young boy.

Terry Lechler testified that Coble worked for a drive-in theater managed by his mother. Although the work was stressful, Coble was a good, dependable worker and did not act inappropriately.

Coble's nephew, Dennis Ivey, testified that Coble taught him how to weld. He worked for Coble at his welding service. Coble was a good teacher and was very patient. Coble loved his son and loved children.

Jerry Crowder was associated with Coble in the Army Reserve for ten or eleven years. He testified that Coble supervised a section of 20–25 men. Coble was fair with the soldiers and was a good supervisor and teacher. Coble cherished his son. Crowder was stunned when he heard about the murders.

Paul Midgett knew Coble from peewee football. Coble was a coach. Midgett testified that Coble was very kind to the children and was a good role model for them. Midgett described an incident when another coach threatened Coble, but Coble refused to get into a confrontation and just shrugged it off. Midgett was shocked when he heard about the murders.

No. 15-70037

Dewayne Kerr testified that he met Coble at the Corsicana State Home. It was a good home and a loving place. Coble was easygoing and well liked. Kerr maintained contact with Coble after Coble went to prison. Coble made some clocks for him.

James Steele was Coble's roommate and good friend at the Corsicana State Home. He testified that Coble was always laughing and happy. Coble did not have a reputation for being a fighter, bully, or vandal. Coble's brother, Arthur, however, was a troublemaker. Coble once paid off one of Steele's debts.

T. C. Bigham testified that he hired Coble to work as a welder at his company. Coble worked there for five years and performed very well as a supervisor.

Dr. Mark Cunningham, a psychologist, testified that Coble is in the group least likely to commit acts of violence in the future. He listed six factors that point to Coble having a positive adjustment to prison and a reduced likelihood of serious violence in prison:

(1) Age. Coble was nearly 60 years old at the time of the retrial in 2008. The risk of violence is high for inmates in their early twenties and falls steadily as they get older.

(2) and (3) Lack of Disciplinary Record and No Evidence of Violent Acts in Prison. Coble had no disciplinary record during the 19 years he had been in prison, and there was no evidence that Coble had committed any acts of violence while he had been in prison. The best predictor of future behavior is past behavior. Violence in the community does not predict violence in prison. Coble worked at a garment factory handling scissors, needles, tools, and machines, but committed no acts of violence. When death row inmates were housed at the Ellis Unit, Coble was eligible to have a cellmate. After he was locked down in a cell by himself for eight or nine years at the Polunsky Unit, he was cooperative and did not have authority conflicts, demonstrating a pretty

15

good tolerance for frustration. Coble facilitated interactions rather than trying to dominate in a predatory sort of way. Research shows that the longer an inmate remains in a compliant mode, without an assault, the less likely that is to occur. Murderers have been shown to be less likely to be involved in potentially violent misconduct than other inmates. In prison, an inmate's life is substantially structured and he is no longer in relationships that trigger the situations that lead to violence. The longer sentence an inmate is facing, generally the lower the rate of misconduct and assaultive misconduct. In a Texas study he found that death-sentenced inmates were more likely to be involved in assaultive misconduct than inmates serving capital life terms.

(4) <u>Education</u>. Inmates who have earned a high school diploma or a GED, such as Coble, have lower rates of violence in prison.

(5) <u>History of employment</u>. Persons who have had long-term employment in the community are industrious and the best adapted in prison. They contribute to the order and stability of the prison setting. The testimony about Coble's organization of sports tournaments and crafts projects is significant because it shows that he is trying to occupy himself in a constructive fashion. It is what would be expected considering his education and employment in the community. Coble's lack of a nurturing and caring mother damaged him but, in spite of that very rocky beginning, Coble has continued to try to do something constructive.

(6) <u>Community relationships</u>. Coble had maintained contact with friends and relatives while in prison. Inmates who continue to have links with the community tend to have better adjustments in prison and are less likely to present a risk of violence.

Dr. Cunningham did not identify any factors that would put Coble at an increased risk of violence.

16

Dr. Cunningham's opinion was that it is "quite unlikely" that Coble would commit serious violence if confined for life in prison. He testified that his opinion is based on scientific methodology which has been peer reviewed. The methodology used by the State's expert, Dr. Coons, for predicting violence in prison is notoriously unreliable, entirely speculative, blind guessing. The major psychological associations are opposed to making the kind of subjective risk assessment that Dr. Coons made in this case, because that method is unreliable and inconsistent with the standard of practice. There is a 94.8 percent error rate in the accuracy of predictions of future dangerousness and only a 1.4 percent error rate in the accuracy of predictions of improbability of future dangerousness.

Coble's son, Gordon W. Coble, testified that his father taught him to weld, worked with him in sports, and taught him about hunting and gun safety, occupational skills, and work ethics. He enjoyed spending time with Coble. Coble was a children's football coach and was active in the community. Coble was very patient, and helped strangers and neighbors. Since Coble has been in prison, they have exchanged letters and greeting cards. Coble has a good relationship with his grandsons and they love him.

Marilyn Finley, who worked with Coble's second wife, Candy Ryan, testified that she called the police because she feared there would be violence when Coble showed up at Ryan's workplace, but no violence occurred. She and Coble were friends. He was never aggressive or violent, but would get depressed. He was a hard worker.

Coble did not testify.

In rebuttal, the State called A. P. Merillat, a Criminal Investigator with the Special Prosecution Unit, which prosecutes crimes committed in prisons or by employees of the prison system. He testified that the Special Prosecution Unit has prosecuted 94 inmates who were serving life sentences for capital

murder. Merillat described the classification process and the categories within general population. According to Merillat, many violent acts committed in prison are unreported. There are abundant opportunities for violence in prison. As an example of unreported prison violence, he testified that a general population inmate at the Telford Unit in Bowie County was beaten, tortured and starved to death by his cellmate and was discovered dead in his cell long after he had died.

In closing argument, Coble's counsel told the jury that Coble had adapted to prison life and was in the lowest risk category for committing acts of violence in prison based on his age, education, lack of disciplinary record, history of employment, and family ties. He argued that Dr. Coons's opinion was unreliable because Dr. Coons was a tea-leaf reader, not a scientist. He characterized Coble's military service, coaching of children's sports teams, volunteer work, craft projects and assistance to other inmates in prison, as mitigating. Coble's impulse to lash out with violence in the context of romantic relationships would not reoccur in prison. Those impulses stemmed from his mother's illiteracy and mental illness and his exposure to horrible things in Vietnam.

During deliberations, the jury asked to see the psychiatric evaluations, testimony regarding a 1967 fight while Coble was in the Marines, and the photographs that had been taken from his cell.

The jury answered the special issues in a manner that required imposition of the death penalty. The TCCA affirmed on direct appeal. *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010). The Supreme Court of the United States denied Coble's petition for a writ of certiorari. *Coble v. Texas*, 131 S. Ct. 3030 (2011).

While his direct appeal was still pending, Coble filed a state habeas application on June 3, 2010. An evidentiary hearing was held in state court in

18

No. 15-70037

2011 on Coble's claims regarding prejudicial publicity, ineffective assistance of counsel in failing to move for a change of venue, and the district attorney's office's alleged conflict of interest.  Following the hearing, the State submitted an affidavit of Russell D. Hunt, Jr., Coble's lead counsel at the retrial.  The trial court adopted the State's proposed findings of fact and conclusions of law, and the TCCA denied relief.  *Ex parte Billie Wayne Coble*, WR-39,707-03 (Tex. Crim. App. Feb. 8, 2012).

Coble filed a 600-page petition for federal habeas relief, raising 21 claims.  The district court did not conduct an evidentiary hearing.  It denied relief on September 30, 2015, and also denied a COA.  *Coble v. Stephens*, 2015 WL 5737707 (W.D. Tex. Sept. 30, 2015).  Coble timely appealed.

## II.  Issues Presented

Coble requests a COA from this Court for seven claims:

(1) and (2) He was deprived of his constitutional right to a fair trial, due process of law, and a reliable sentence because his trial was conducted in an inherently unfair venue, and trial counsel rendered ineffective assistance by failing to move for a change of venue;

(3) and (4) The prosecution had a disqualifying conflict of interest and trial counsel rendered ineffective assistance by failing to seek to recuse the prosecution;

(5) The unreliable "junk" science testimony of Dr. Coons violated his constitutional rights;

(6) The irrelevant, inflammatory, false, and perjured testimony of A. P. Merillat violated his constitutional rights; and

(7) Trial counsel rendered ineffective assistance by failing to present expert psychiatric testimony.

19

No. 15-70037

## III.  Discussion of Issues

In order to obtain a COA, Coble must make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  With respect to claims dismissed on procedural grounds, the petitioner must show both "[1] that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and [2] that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

When "reviewing [a] request for a COA, we only conduct a threshold inquiry into the merits of the claims [the petitioner] raise[s] in his underlying habeas petition."  *Reed v. Stephens*, 739 F.3d 753, 764 (5th Cir. 2014) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003)).  This "threshold inquiry" is not a "full consideration of the factual or legal bases adduced in support of the claims," but rather "an overview of the claims in the habeas petition and a general assessment of their merits."  *Miller-El*, 537 U.S. at 336; *see also Buck v. Davis*, ___ S. Ct. ___, 2017 WL 685534, at *11–*12 (U.S. Feb. 22, 2017).  In generally assessing the claims for relief in a COA application, "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate."  *Id.* at 342.  And "in a death penalty case, 'any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor.'"  *Ramirez v. Dretke*, 398 F.3d 691, 694 (5th Cir. 2005) (alteration in original) (quoting *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000)).

For the reasons that follow, we DENY a COA for claims 1-4 and 7 because Coble has not shown that "jurists of reason could disagree with the

district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327.  Because this is a death penalty case and we are to resolve in Coble's favor any doubts as to whether a COA should issue, we GRANT a COA for claims 5 and 6.  These issues appear to have been addressed fully in the briefing filed in the district court and this court.  If, however, Coble wishes to file a supplemental brief with respect to the merits of the claims, he may do so within thirty days of the date of this order.  The supplemental brief should address *only* matters, if any, that have not already been covered in his brief in support of the COA application.  If Coble files a supplemental brief, the State may file a response fifteen days thereafter, to be similarly limited to matters that have not already been covered in its brief in opposition to Coble's COA application.  We now turn to address the five remaining claims.

## A.  Claims (1) and (2), Venue

Coble requests a COA for his claims that he was deprived of due process and a fair trial because his trial was conducted in an inherently unfair venue, and that trial counsel rendered ineffective assistance by failing to move for a change of venue.

The Sixth Amendment guarantees a criminal defendant the right to a fair trial by an impartial jury.  *Skilling v. United States*, 561 U.S. 358, 377 (2010).  The failure to provide such a trial violates due process.  *Id*. at 378.  However, the Constitution does not require that jurors be ignorant of the facts and issues involved.  *Dobbert v. Florida*, 432 U.S. 282, 301 (1977).  "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair."  *Id*. at 303.  To succeed on a claim of denial of a fair trial because of adverse pretrial publicity, a habeas petitioner must demonstrate that "the particular jurors selected for

21

service in his case were biased against him." *Busby v. Dretke*, 359 F.3d 708, 725 (5th Cir. 2004); *see also Moore v. Johnson*, 225 F.3d 495, 504 (5th Cir. 2000) (stating that generally, a habeas petitioner seeking "relief as a result of pretrial publicity must demonstrate an actual, identifiable prejudice on the part of members of the jury that is attributable to that publicity").

Alternatively, prejudice may be presumed when the record demonstrates that the trial was conducted in an inherently prejudicial atmosphere "utterly corrupted by press coverage." *Dobbert*, 432 U.S. at 303 (internal quotation marks and citation omitted); *see also Rideau v. Louisiana*, 373 U.S. 723, 726–27 (1963). The presumption applies only in "extreme" cases. *See Skilling*, 561 U.S. at 381.

To establish ineffective assistance of trial counsel, a petitioner must show that counsel's performance was deficient and that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

In an affidavit submitted to the state habeas court, Coble's lead counsel, Russell D. Hunt, Jr., stated that after conducting research to obtain the perspective of McLennan County residents, he decided that Coble was not entitled to a change of venue. Hunt was also concerned that if a motion were filed and granted, the case might be moved to a less favorable venue with potentially more pro-death penalty jurors. As part of their trial strategy, Hunt stated that they included questions about media exposure on the questionnaire completed by all venire members, believing that would sufficiently alert them to individuals who had been previously exposed to media coverage about the case.

The state habeas court held that Coble's due process claim is procedurally barred because it was not raised on direct appeal and because trial counsel did not move for a change of venue. With respect to Coble's ineffective assistance of counsel claim, the state habeas court found that

No. 15-70037

Coble's counsel discussed a change of venue and performed legal research on the issue, but decided not to pursue it because they did not believe it would be meritorious.  The court stated that there was nothing to indicate that the jury selected was not impartial and did not give Coble a fair trial.  It thus concluded that counsel did not perform deficiently.

The district court held that Coble failed to establish that any of the jurors who served were prejudiced by the publicity.  It concluded that Coble was not entitled to a presumption of prejudice because he failed to present anything to indicate that the general environment in McLennan County was "utterly corrupted by press coverage." *Dobbert*, 432 U.S. at 303.  The court stated that the murder and first trial occurred over 20 years prior—sufficient time for almost two generations of citizens to become eligible to serve on a jury, who had not been exposed to the level of publicity and public interest that surrounded the first trial.

Coble argues that his due process claim is not procedurally defaulted, because the claim depended on extra-record evidence, including the compilation of media coverage, which was not in the record on direct appeal. He contends further that to the extent the claim was barred because trial counsel did not move for a change of venue, they rendered ineffective assistance by failing to do so.

Coble argues that he is entitled to a presumption of prejudice and need not show that any juror was biased, because the publicity "so pervaded or saturated the community as to render virtually impossible a fair trial by an impartial jury drawn from that community." *Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984).  As support, he offers the following:

(1) Of the 80 prospective jurors who submitted questionnaires, most of them (43) had heard of the case.  Of those 43, 29 had either made up their

23

minds already or were uncertain.  Of the 29, 17 had made up their minds as to punishment.

(2) Six of the jurors who served had heard of the case beforehand.

(3) In 2008 (the year of the punishment retrial) there were 22 local newspaper articles and 61 television stories about the case.  In 1990, when the case was tried the first time, there were only 18 articles.  Six additional articles were published in 2007, when the punishment phase retrial was ordered.

(4) A state court judge, who presided in the same courthouse where the retrial was to be conducted, criticized the Fifth Circuit for ordering the retrial and referred to Coble as "this vermin who snuffed out three innocent lives like they were nothing more than a candle."

(5) The main road outside the victims' former residence was renamed "Vicha Road" in their honor.

(6) The prejudice was exacerbated by the community's indignation at the retrial, which was seen as an outrage and a waste of taxpayer money.

The State responds that Coble's claim could have been raised on direct appeal because it relies heavily on the voir dire testimony and juror questionnaires, which were in the record on direct appeal.  Even assuming that the issue could not have been raised on direct appeal, the State contends that it is still procedurally barred because Coble's counsel did not move for a change of venue.  The State argues that ineffective assistance of counsel is not an exception to the procedural default doctrine but is, instead, a separate and independent claim which Coble abandoned, by failing to adequately brief it.

The State contends further that, even if the due process claim is not procedurally barred, Coble failed to establish the existence of any jury bias resulting from the publicity.  It points out that none of the 17 venire members who indicated on their questionnaires that they had made up their minds were selected to serve.  Although half of the jurors admitted to having heard of the

case before trial, the record does not indicate that any of them were persuaded by any publicity.

The State argues that presumptive prejudice is inapplicable because Coble has not shown that the trial atmosphere was "utterly corrupted by press coverage." *Dobbert*, 432 U.S. at 303. According to the State, most of the articles written around the time of Coble's 2008 retrial are almost entirely factual. The articles that Coble believes are the most prejudicial – those quoting Judge Ralph Strother, who originally prosecuted Coble in 1990 – were published years before Coble's retrial.

Reasonable jurists would not debate the district court's conclusions that (1) Coble failed to show that the jurors who served were affected by the publicity and could not render a verdict based solely on the evidence, and (2) he failed to demonstrate inherent prejudice. Coble's ineffective assistance claim is not adequate to deserve encouragement to proceed further in the light of trial counsel's affidavit outlining the strategic reasons for counsel's decision not to seek a change of venue. We therefore deny a COA for Claims (1) and (2).

## B. (3) and (4) Conflict of Interest

J. R. Vicha, who was 11 years old when Coble murdered his father and grandparents, was a prosecuting attorney in the McLennan County District Attorney's Office at the time of the retrial and testified at the retrial regarding the events on the day of the murders. Although he testified that he was an attorney, he did not identify his employer. Coble requests a COA for his claim that Mr. Vicha's employment with the prosecutor's office was a disqualifying conflict of interest that deprived Coble of his due process rights. He also requests a COA for his related claim that his counsel rendered ineffective assistance by failing to file a motion to recuse the prosecution.

Prior to the retrial, the prosecutor stated that his office had built a "Chinese wall" and did not think J. R. Vicha was disqualified as a witness.

25

## No. 15-70037

Defense counsel agreed, but questioned Mr. Vicha to make a record that he had been totally separated from the District Attorney's office "in case somebody would later come by and accuse you of pressuring your boss to seek the death penalty, you can say no, you never put any pressure on them to do that." Mr. Vicha testified outside the presence of the jury that he had nothing to do with the case; that he had not had any discussions about the case with anyone from the prosecutor's office; that he did not even know that he was going to testify until just a few weeks before trial; and that he had nothing to do with the prosecutor's decision to seek the death penalty.

Coble raised these claims in his state habeas petition. At the state court evidentiary hearing in 2011, Coble's initial co-counsel for the retrial, Scott Stevens, testified that Mr. Vicha's employment with the prosecutor's office was an absolute conflict of interest and an ethical violation, but that a motion for disqualification would likely be unsuccessful because it would require proof rising to the level of a due process violation. Alex Calhoun, who replaced Stevens as co-counsel, testified that he discussed with lead counsel Hunt the possibility of filing a motion to recuse the District Attorney's Office. He conducted some research, but found nothing conclusive in Coble's favor. He admitted that he was not familiar with cases holding that the failure of the prosecutor to recuse may be reversible error if it amounts to a due process violation. Calhoun could not say whether Mr. Vicha's testimony affected the outcome of the case. Lead trial counsel Hunt stated in his affidavit that after researching the issue and conducting his own investigation into whether Mr. Vicha complied with the Chinese wall policy, he determined that there was no legal basis to seek recusal of the prosecutor's office. Further, he was not sure he wanted the District Attorney's Office to be recused because it was possible that the court would have appointed a more aggressive and effective special prosecutor.

The state habeas court found that Mr. Vicha did not have access to any information and did not participate in any decisions regarding Coble's retrial. The court found that Coble's counsel were not ineffective because they investigated the issue, performed legal research, and concluded that they did not have a legal basis to seek recusal of the District Attorney's office. The state habeas court rejected Coble's contention that defense counsel's voir dire of Mr. Vicha was a ploy designed to insulate counsel from future ineffective assistance claims.

The district court held that the conflict of interest claim was procedurally defaulted. Alternatively, the district court held that Coble failed to identify any constitutional rights violated by Mr. Vicha's testimony and that Coble merely speculated that the death penalty was pursued on retrial because of Mr. Vicha's employment with the District Attorney's Office.

Coble contends that the claim is not procedurally barred because, to the extent it was based on the failure to raise the claim at trial, his counsel were ineffective. He contends further that the claim could not have been raised on direct appeal because it relies on extra-record evidence.

With respect to the merits, Coble points out that Mr. Vicha was a member of the District Attorney's office; Mr. Vicha's father had a long relationship with the head of that office; and Mr. Vicha was personally close to a sitting judge who was Coble's prosecutor at the initial trial. Coble argues that because the prosecutor at the retrial indicated that he knew Mr. Vicha and addressed him as "J.R.", the jurors could have inferred that Mr. Vicha worked in the prosecutor's office. Coble argues that under these circumstances, an impartial decision on whether to seek the death penalty was compromised, because Mr. Vicha's status as a prosecutor made it a foregone conclusion.

No. 15-70037

Coble claims that the conflict of interest prejudiced him because a disinterested prosecutor would not have sought the death penalty at a retrial in the light of the facts that Coble was 60 years old, was in very poor health, and had no disciplinary charges while serving in prison for the prior 19 years. Coble maintains that the danger was not that Mr. Vicha might have been involved in the prosecution or that errors occurred as a result of his testimony. Instead, the prejudice resulted from Mr. Vicha's status as a member of the District Attorney's office, which biased his employer's decision-making process as to whether to seek the death penalty.

Coble contends that Texas does not recognize the "Chinese wall" concept and under Texas law, there is a presumption of shared confidences, so that the personal conflicts of one attorney are imputed to all other members of a firm. He contends further that the prosecution was disqualified under Texas ethical rules, because there was at least a public suspicion of ethical impropriety and bias resulting from the victim's employer's decision to seek the death penalty. He contends that counsel were ineffective in their failure to research, follow, and apply state law.

The State responds that Coble's conflict of interest claim is procedurally barred because he failed to preserve it for appeal and failed to properly raise it on direct appeal. The State contends that because Coble's claim relies on Texas law, it is not constitutionally cognizable on federal habeas. The district court was therefore correct in concluding that Coble failed to identify any constitutional right that was violated by the admission of Mr. Vicha's testimony. The State contends further that the claim is frivolous because no conflict of interest existed and, even if it did, counsel's decision not to file a motion to recuse was a reasonable strategic decision that did not prejudice Coble's right to a fair trial. Finally, the State argues that even assuming deficient performance, Coble was not prejudiced because it is not hard to

imagine another prosecutor, faced with the details of Coble's triple murder and other crimes, choosing to seek the death penalty.

The district court's resolution of these claims is not debatable. As the district court noted, to the extent that the claims are based on Texas law, they are not grounds for federal habeas relief. These claims are not adequate to deserve encouragement to proceed further, in the light of the fact that trial counsel articulated reasonable strategic reasons for not moving to disqualify the District Attorney's Office, and Coble offered nothing more than speculation to support his contention that Mr. Vicha's employment as a prosecutor had any influence on the prosecutor's decision to seek the death penalty in the retrial. We therefore deny a COA for these claims.

## C. Claim (7) Ineffective Assistance, Psychiatric Testimony

Finally, we turn to consider Coble's request for a COA for his claim that his counsel rendered ineffective assistance by failing to present expert psychiatric testimony linking his behavior at the time of the murders to his mitigating evidence of mental illness and troubled background.

This Court described the mitigating evidence presented at Coble's first trial, much of which was also presented at the 2008 retrial:

> Coble's father died before he was born, and when he was eleven, his mother suffered a nervous breakdown, so Coble was sent to live at a state facility. He lived at the orphanage until he was seventeen, at which point he joined the Marines and served in Vietnam. During his four years of service, Coble served as a machine gunner and was involved in combat. Upon his return to the states, Coble was hospitalized due to trauma he experienced in the war. Likewise, Coble's sister testified that he was different after he returned from Vietnam. Coble offered testimony that he was involved with various youth programs over the years, that he had a good relationship with his son, and that he got along well with co-workers. Coble served as a section leader in the U. S. Army reserves and was well respected.

No. 15-70037

*Coble v. Cockrell*, 80 F. App'x 301, 306 (5th Cir. 2003) (opinion granting a COA). In addition, at Coble's first trial, the defense presented expert psychiatric testimony:

> Coble also presented the testimony of two psychiatrists. The first, Dr. Stephen Mark, testified that Coble was dangerous and might continue to be a danger. In fact, Mark testified that everything in Coble's history would make him a continuing threat. Mark also testified that Coble suffered from post-traumatic stress disorder (PTSD) and bipolar disorder, and was prone to become "[p]otentially explosive and potentially aggressive and assaultive." Mark traced the post-traumatic disorder to Coble's experience in Vietnam, and suggested that the bipolar disorder might be hereditary. Mark also indicated that these illnesses made Coble susceptible to severe mood swings, which resulted in a loss of control on the day of the murders.

> Mark did, however, indicate that Coble would be less likely to be violent if he took medication. In fact, Mark indicated that, had he known, before the murders, of Coble's past and the depression Coble was experiencing because of the pending divorce and kidnapping charges, he would have recommended hospitalization for further treatment and evaluation. Mark also conceded that if Coble refused to take medication he would probably be violent in the future.

> Dr. Grigson, the second defense expert, testified that Coble was suffering from severe depression at the time of the murders, and that it was very improbable that Coble would commit this type of offense again. Specifically, Grigson stated that Coble was more horrified by the pictures of the victims than anyone, and that Coble had feelings of remorse and guilt. Both psychiatrists agreed that Coble linked the loss of his wives with the loss of his mother, such that the divorces triggered severe bouts of suicidal depression….

*Id.* at 306–07.

> Dr. Grigson also discussed a 1964 psychiatric report, created by Dr. Ralph Hodges, which classified the fifteen-year-old Coble as having a "sociopathic personality disturbance of the dissocial type." Dr. Grigson stated that the term "sociopath" did not mean the same thing in 1964 as it does now, and that a diagnosis of an individual as a sociopath could not be made until a person was

eighteen years old. He concluded that Coble "was not a sociopath then, and not a sociopath now."

*Coble v. Quarterman*, 496 F.3d 430, 445–46 (5th Cir. 2007) (opinion granting habeas relief).

This Court granted federal habeas relief on the ground that "there is a reasonable likelihood that the jury was precluded from giving full effect to Coble's mitigating evidence." *Id.* at 447. The Court stated the evidence could not be given effect in response to the deliberateness special issue. *Id.* Although such evidence may have had mitigating relevance to the future dangerousness special issue, and the jury could have given it some effect in response to that issue, the Court found that it was equally conceivable that the jury might have found the evidence aggravating rather than mitigating. *Id.* at 448. The Court concluded that:

> [i]t is clear that Coble's evidence of mental illness and troubled background had meaningful mitigating relevance beyond the scope of the two special issues [and] there is a reasonable likelihood that the jury was unable to give meaningful consideration and effect to a major mitigating thrust of Coble's evidence—its tendency to make him less morally culpable for his crimes. . . .

*Id.*

When Coble's punishment retrial was conducted in 2008, the jury was asked to answer a special punishment issue on mitigation. Coble argues that his counsel were ineffective by not presenting at his retrial psychiatric evidence similar to that presented in his initial trial, and by failing to heed this Court's explicit roadmap when it remanded the case for a new punishment hearing. He notes that the jury asked to view his psychiatric evaluations, but the defense had none to offer. Coble contends that such testimony would have discredited Dr. Hodges, would have shown Coble to be less morally culpable, and would have buttressed the testimony of the lay witnesses about Coble's depression, military service, and troubled background.

31

No. 15-70037

In his affidavit presented in the state habeas proceedings, Coble's lead counsel at the retrial, Hunt, explained that the defense did not present expert testimony because it would be extremely negative and harmful to their mitigation case, and because the State could have required Coble to undergo an examination by Dr. Coons, outside of counsel's presence:

> We decided not to present psychological testimony based on personal interviews of Mr. Coble because our psychologist Dr. Carter who had examined Mr. Coble personally felt that any credible psychological or psychiatric evaluation of Mr. Coble would result in testimony which would be extremely negative and harmful to our mitigation case.
>
> Additionally, if we had presented Dr. Carter's examination results to the jury, the State could then have submitted Mr. Coble to an examination by Dr. Coons, out of our presence. As stated above, the results of such a personal examination by Dr. Coons would have strengthened the credibility of Dr. Coons's opinion regarding future dangerousness. We were concerned that this would in turn strengthen the State's argument that Coble was a sociopath and thus a future danger, thereby warranting the death penalty.

Hunt consulted with Dr. Carter about the possibility of PTSD playing a role in the offense, and Dr. Carter indicated that he did not believe such evidence would be useful for mitigation. Based on Dr. Carter's opinion, Hunt agreed that evidence of PTSD would have been of marginal relevance because of the difficulty of establishing a nexus between that disorder and the murders that occurred 20 years after Coble had served in Vietnam.[6]

Hunt described the defense strategy in his affidavit:

---

[6] One of the exhibits attached to Coble's first state habeas application, filed in 1997 by the same lawyer who currently represents him, was a report of Dr. Mary Alice Conroy, who had evaluated Coble and found no evidence that Coble's actions at the time of the murders were specifically related to any of his Vietnam experiences. Instead, she found that Coble's PTSD symptoms seemed to have resolved in a year or two.

> Our primary strategy was to focus on the "future dangerousness" special issue, and to secondarily argue that Mr. Coble's post-offense rehabilitative efforts were mitigating. We knew that we could not argue about guilt or innocence, and that the facts of the case were bad enough that the previous jury had imposed the death penalty, so we figured that our best approach would be to focus on Mr. Coble's intervening 19 years of sterling behavior in prison. We thought that if we could get the jury to focus on how well Mr. Coble had acted while in prison and institutional settings, rather than on the facts of the original case, we would have a reasonable shot at a life sentence.

In furtherance of that strategy, the defense presented Dr. Cunningham's testimony, which was based on statistical analysis of the likelihood of Coble's future dangerousness; character witnesses to establish Coble's good character outside of romantic relationships; the testimony of death row inmates about Coble's exceptional character while he was on death row; and the testimony of family members to show the deprivation of emotional nourishment that Coble received as a child. Hunt stated that the defense wanted to negate the effect of Dr. Coons's testimony and therefore wanted to keep him from interviewing Coble, thereby further weakening the basis for Dr. Coons's opinion regarding future dangerousness.

The state habeas court found that Coble's counsel made a tactical decision not to present expert testimony on PTSD based on the advice of the defense expert, Dr. Carter. It found that Coble's counsel were concerned that any potential benefit from having Coble evaluated by a testifying expert for the defense was outweighed by the risk to Coble of being evaluated by Dr. Coons. Dr. Carter had indicated to counsel that such an examination could be seriously damaging to Coble's case. Counsel's overall goal was to get a sentence other than death by establishing that Coble was not a future danger, by focusing on Coble's 19 years of good behavior in prison.

No. 15-70037

The district court held that counsel's decision to not present psychiatric evidence was a strategic decision and that the evidence could have been more harmful to Coble's case than mitigating. Even if counsel's performance were deficient, the court stated that Coble had not presented anything to call into doubt the state court's determination that there was no prejudice. The district court concluded that the lack of prejudice is clear because the evidence of Coble's future dangerousness was overwhelming.

Coble challenges the validity of counsel's strategic decision, pointing to his unblemished 19-year prison record, the fact that he was elderly and in bad health, and the fact that his 20-year-old violence arose in a situational context that could never re-occur in prison. Coble argues that he was prejudiced by counsel's failure to present expert testimony because it crippled the defense presentation and final argument. Instead of showing the jury how Coble's mental state at the time of the murders was characterized by severe depression, and without expert testimony about the lifelong effects of his bi-polar disorder and PTSD due to his Vietnam service, the defense was reduced to arguing that Vietnam was a "bad place" and that Coble had seen horrors there. Coble argues that the failure to link his depression, mental illness, bi-polar disorder and PTSD to his behavior at the time of the murders, as the Fifth Circuit did in its prior opinion, meant that the jury was unable to give it significant mitigating value in answering the special issue.

The State responds that counsel had valid strategic reasons for not presenting the testimony, and Coble has failed to demonstrate that counsel's chosen strategy was so poor that it deprived him of any opportunity to get a fair trial. The State maintains that it was reasonable for Coble's counsel to believe that evidence of his mental disorders would likely be perceived as aggravating rather than mitigating. Evidence that Coble was bipolar and susceptible to violent mood swings and manic depression could be more

damaging than beneficial. According to the State, using a potentially hereditary condition such as bipolar disorder along with a condition (PTSD) that he developed over 20 years prior to the murders to excuse his acts as "beyond his control" could also appear callous to the jury and potentially bolster the State's contention that Coble is a sociopath who has no concern for the well-being of others.

The State contends further that even if counsel's performance was deficient, Coble cannot demonstrate a reasonable probability that the alleged errors would have affected the outcome of the punishment retrial, because the evidence of his future dangerousness was overwhelming. Therefore, he was not prejudiced.

Reasonable jurists would not debate the district court's decision to defer to the state court's conclusion that counsel did not perform deficiently and that Coble was not prejudiced. It is true that this Court ordered a retrial on the ground that the jury was unable to give effect to Coble's mitigating evidence presented in the first trial, which included psychiatric testimony linking his actions at the time of the murders to his mental health issues and troubled background. However, the decision turned on the fact that the law at that time did not require the jury to be given a mitigation special issue, such as the one given at Coble's retrial. The district court deferred to the state habeas court's findings that, (1) after consulting with their expert, Dr. Carter, defense counsel made a strategic decision not to use similar evidence at the retrial, but to focus instead on the future dangerousness special issue, relying on Coble's age, poor health, his lack of a disciplinary record after having served 19 years in prison, and the fact that the circumstances in which the murders took place, arising out of a romantic relationship, would not reoccur in prison; and (2) their decision to present mitigating evidence of his background, mental condition, and service in Vietnam through lay witnesses, and not to present mental

No. 15-70037

health expert testimony, was intended to prevent the State's expert, Dr. Coons, from examining Coble. Reasonable jurists would not debate the district court's conclusion that this decision was not unreasonable inasmuch as the defense expert had warned counsel that such an examination could result in damaging testimony. We therefore deny a COA for this claim.

## IV. Conclusion

For the reasons given above, we grant a COA for Claims (5) and (6), and deny a COA for Claims (1), (2), (3), (4), and (7). Coble may file a supplemental brief addressing the merits of Claims 5 and 6 within thirty days of the date of this order, addressing *only* matters that have not already been covered in his COA brief. If Coble files a supplemental brief, the State may file a response fifteen days thereafter, limited to matters not already addressed in its COA opposition brief.